## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MEDICOR LTD., *et al.*,[1] | ) | Case No. 07-10877 (MFW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |

## DISCLOSURE STATEMENT FOR
## DEBTORS' FIRST AMENDED CHAPTER 11 PLAN OF LIQUIDATION

**THIS IS NOT A SOLICITATION FOR ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.**

**THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT**

LOWENSTEIN SANDLER PC
Kenneth A. Rosen
Jeffrey D. Prol
Jeffrey A. Kramer
Michael Savetsky
65 Livingston Avenue
Roseland, New Jersey 07068
Telephone: (973) 597-2500
Facsimile: (973) 597-2400

– and –

GREENBERG TRAURIG, LLP
Victoria W. Counihan (DE Bar No. 3488)
Dennis Meloro (DE Bar No. 4435)
The Nemours Building
1007 North Orange Street, Suite 1200
Wilmington, Delaware 19801
Telephone: (302) 661-7000
Facsimile: (302) 661-7360

Counsel for Debtors and Debtors in Possession

---

[1] The Debtors are the following entities: MediCor Ltd., International Integrated Incorporated, International Integrated USA Incorporated, MediCor Management, Inc., MediCor Development Company, MediCor Aesthetics, III Acquisition Corporation d/b/a PIP.America, and Intellectual Property International, Inc.

# I. INTRODUCTION

On June 29, 2007 (the "Petition Date"), MediCor Ltd. ("MediCor"), International Integrated Incorporated ("III"), International Integrated USA Incorporated ("III USA"), MediCor Management, Inc. ("MediCor Mgmt"), MediCor Development Company ("MDC"), MediCor Aesthetics ("MediCor Aesthetics"), III Acquisition Corporation d/b/a PIP.America ("PIP.America"), and Intellectual Property International, Inc. ("IPI") (each a "Debtor" and collectively, the "Debtors"), filed voluntary petitions for relief pursuant to chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). Since the Petition Date, the Debtors have continued in the management of their affairs and the possession of their properties as debtors-in-possession, subject to the control and supervision of the Bankruptcy Court.

The Debtors submit this Disclosure Statement in connection with the solicitation of acceptances and rejections with respect to the Debtors' First Amended Chapter 11 Plan of Liquidation (the "Plan"), a copy of which is attached as Exhibit A to this Disclosure Statement.

The purpose of this Disclosure Statement is to set forth information (1) regarding the history of the Debtors, their businesses and the Chapter 11 Cases, (2) concerning the Plan and alternatives to the Plan, (3) advising the Holders of Claims and Equity Interests of their rights under the Plan, (4) assisting the Holders of Claims in making an informed judgment regarding whether they should vote to accept or reject the Plan and (5) assisting the Bankruptcy Court in determining whether the Plan complies with the provisions of Chapter 11 of the Bankruptcy Code and should be confirmed.

By order dated _____, 2010, the Bankruptcy Court approved this Disclosure Statement, in accordance with Section 1125 of the Bankruptcy Code, as containing "adequate information" to enable a hypothetical, reasonable investor typical of holders of Claims against, or Equity Interests in, the Debtors to make an informed judgment as to whether to accept or reject the Plan, and authorized its use in connection with the solicitation of votes with respect to the Plan. **APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.** No solicitation of votes may be made except pursuant to this Disclosure Statement and Section 1125 of the Bankruptcy Code. In voting on the Plan, holders of Claims should not rely on any information relating to the Debtors and their businesses other than that contained in this Disclosure Statement, the Plan and all exhibits and appendices hereto and thereto.

The Debtors may supplement or amend this Disclosure Statement or any Exhibits attached hereto at any time prior to the hearing to approve this Disclosure Statement.

The statements contained in this Disclosure Statement are generally made as of the date hereof, unless another time is specified, and delivery of this Disclosure Statement shall not create an implication that there has been no change in the information set forth herein since the date of this Disclosure Statement or the date of the materials relied upon in preparation of this Disclosure Statement. The Debtors have prepared the information contained herein in good

faith, based upon the information available to them. No audit, however, of the financial information herein has been conducted. Certain of the statements contained in this Disclosure Statement, by nature, are forward-looking and contain estimates and assumptions. There can be no assurance that such statements will be reflective of actual outcomes.

The description of the Plan contained in this Disclosure Statement is intended as a summary only and is qualified in its entirety by reference to the Plan itself. If any inconsistency exists between the Plan and this Disclosure Statement, the terms of the Plan are controlling. The Plan is a legally binding arrangement and should be read in its entirety. No summary of the Plan should be relied upon in determining whether to accept or reject the Plan. Each Holder of a Claim or Equity Interest should read, consider and carefully analyze the terms and provisions of the Plan as well as the information contained in this Disclosure Statement and the other documents provided herewith.

**UNLESS OTHERWISE DEFINED HEREIN, ALL CAPITALIZED TERMS CONTAINED IN THIS DISCLOSURE STATEMENT SHALL HAVE THE RESPECTIVE MEANINGS ASCRIBED TO THEM IN THE PLAN.**

Attached as Exhibits A through D to this Disclosure Statement are copies of the following documents:

1.    The Plan (Exhibit A);

2.    Order of the Bankruptcy Court, dated _____, approving this Disclosure Statement (the "Disclosure Statement Order") (Exhibit B);

3.    Notice (a) fixing the time for casting Ballots either accepting or rejecting the Plan; (b) fixing the deadline for filing objections to Confirmation of the Plan; and (c) scheduling a hearing on Confirmation of the Plan (the "Confirmation Hearing Notice") (Exhibit C);

4.    The Debtors' Corporate Organization Chart (Exhibit D) ; and

5.    Calculation of Statutory Trustee Fees and Liquidation Costs in a Chapter 7 Liquidation (Exhibit E).

In addition, a ballot for the acceptance or rejection of the Plan (the "Ballot") is enclosed with the Disclosure Statement submitted to the Holders of Claims that are entitled to vote to accept or reject the Plan.

Holders of Claims and Equity Interests may also obtain a copy of the exhibits and schedules to the Plan that shall be filed with the Bankruptcy Court on or before the date that is ten (10) days prior to the Voting Deadline (the "Plan Exhibits"), once filed, from the Debtors by: (a) accessing the website of the Debtors' counsel at http://www.lowenstein.com/medicor; (b) by calling the Debtors' claims, noticing and balloting agent, Epiq Bankruptcy Solutions, LLC (the "Balloting Agent") at 1-646-282-2500; or (c) sending a written request sent to the Balloting Agent at:

**By US Mail**              OR       **By Overnight Mail or Hand Delivery**

MediCor, Ltd Ballot Processing              MediCor, Ltd Ballot Processing
c/o Epiq Bankruptcy Solutions, LLC          c/o Epiq Bankruptcy Solutions, LLC
FDR Station, P.O. Box 5014                   757 Third Avenue, 3rd Floor
New York, NY 10150-5014                      New York, NY 10017

**THIS DISCLOSURE STATEMENT CONTAINS INFORMATION SUPPLEMENTARY TO THE PLAN AND IS NOT INTENDED TO TAKE THE PLACE OF THE PLAN. CREDITORS ARE ADVISED TO STUDY THE PLAN CAREFULLY TO DETERMINE THE PLAN'S IMPACT ON THEIR CLAIMS OR EQUITY INTERESTS. THE INFORMATION CONTAINED HEREIN HAS NOT BEEN SUBJECT TO A CERTIFIED AUDIT. ALTHOUGH GREAT EFFORT WAS TAKEN TO ENSURE THE ACCURACY OF THIS DISCLOSURE STATEMENT AND THE ACCOMPANYING PLAN, NEITHER THE DEBTORS NOR THEIR PROFESSIONALS CAN WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN AND THEREIN IS WITHOUT INACCURACIES OR ERRORS.**

**THIS DISCLOSURE STATEMENT AND THE PLAN ARE THE ONLY INFORMATION AUTHORIZED TO BE DISTRIBUTED TO CREDITORS AND INTEREST HOLDERS. CREDITORS SHOULD NOT RELY ON REPRESENTATIONS OTHER THAN THOSE SET FORTH IN THE DISCLOSURE STATEMENT OR THE PLAN IN CONSIDERING WHETHER TO ACCEPT OR REJECT THE PLAN.**

**YOU ARE STRONGLY URGED TO READ THIS DISCLOSURE STATEMENT BECAUSE IT CONTAINS A SUMMARY OF THE PLAN AND IMPORTANT INFORMATION CONCERNING THE DEBTORS' HISTORY AND OPERATIONS. THE DISCLOSURE STATEMENT ALSO PROVIDES INFORMATION REGARDING ALTERNATIVES TO THE PLAN. A COPY OF THE PLAN ACCOMPANIES THIS DISCLOSURE STATEMENT AS A SEPARATE DOCUMENT. THE DESCRIPTION OF THE PLAN IN THIS DISCLOSURE STATEMENT SUMMARIZES ONLY CERTAIN PROVISIONS OF THE PLAN AND IS NOT, NOR IS IT INTENDED TO BE, A COMPLETE DESCRIPTION OF THE PLAN. THE PLAN SHOULD BE READ CAREFULLY AND INDEPENDENTLY OF THIS DISCLOSURE STATEMENT. YOU SHOULD CONSULT YOUR OWN COUNSEL AND/OR FINANCIAL ADVISOR IN CONNECTION WITH YOUR CLAIM(S) AGAINST THE DEBTORS AND THE TREATMENT ACCORDED YOUR CLAIM(S) OR INTEREST(S) UNDER THE PLAN.**

**THIS DISCLOSURE STATEMENT MAY NOT BE RELIED UPON FOR ANY PURPOSES OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN, AND NOTHING CONTAINED HEREIN SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY. NO REPRESENTATIONS BY ANY PERSON CONCERNING THE DEBTORS (PARTICULARLY AS TO THEIR BUSINESS OPERATIONS, OR THE VALUE OF THEIR PROPERTIES) ARE AUTHORIZED BY THE DEBTORS OTHER THAN AS SET FORTH IN THIS**

DISCLOSURE STATEMENT AND SHOULD NOT BE RELIED ON BY YOU IN ARRIVING AT YOUR DECISION TO ACCEPT OR REJECT THE PLAN.

## II. OVERVIEW OF THE PLAN

THE FOLLOWING IS A BRIEF SUMMARY OF THE TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN. THE DESCRIPTION OF THE PLAN SET FORTH BELOW CONSTITUTES A SUMMARY ONLY AND IS QUALIFIED, IN ITS ENTIRETY, BY THE PLAN, THE PLAN EXHIBITS AND THE OTHER PLAN DOCUMENTS. CREDITORS AND OTHER PARTIES IN INTEREST ARE URGED TO REVIEW THE PLAN ITSELF. IN THE EVENT OF AN INCONSISTENCY BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN, THE PLAN CONTROLS.

**A.     General Overview.**

The Plan is a plan of liquidation, pursuant to which the net proceeds of the prior sale of the Debtors' assets will be distributed to certain plan holders of Allowed Claims. In sum, the Plan provides that MediCor's pre-petition Senior Lenders (as defined below) on account of their pre-petition secured loans in excess of $57 million will receive the Distributable Cash, along with their pro rata share of certain proceeds of litigation to be pursued by a liquidating trustee appointed under the Plan.

Additionally, pursuant to the Plan and a settlement with the Senior Lenders and Committee, holders of Allowed General Unsecured Claims will receive on account of pre-petition unsecured indebtedness owed to them by the Debtors, pro rata shares of the following after the payment of the reasonable fees and expenses of a liquidating trustee appointed under the Plan: (i) $700,000 cash (the "General Unsecured Cash Payment"); (ii) $ 275,000.00 (the "D&O Settlement Amount"); and (iii) certain proceeds of litigation to be pursued by the liquidating trustee.

Under the Plan, Administrative Expense Claims and Priority Tax Claims are unclassified and are to be paid in full or upon such other terms as the Debtors and the affected creditor may agree. Class 1 Priority Non-Tax Claims are left unimpaired, and are to be paid in full, or upon such other terms as the Debtors and the affected creditor may agree. Holders of Southwest Exchange Claims, Interdebtor Claims, Non-Debtor Subsidiary Claims, Stock Claims and Equity Interests in the Debtors will receive no distributions.

**B.     Summary of Treatment of Claims and Equity Interests Under the Plan.**

Set forth below is a table summarizing the classification and treatment of Claims and Equity Interests under the Plan and the estimated distributions to be received by the Holders of such Claims and Equity Interests thereunder. The table also sets forth the treatment of unclassified Claims. The actual distributions may differ from the estimates set forth in the table depending on, among other things, variations in the amounts of Allowed Claims and the existence of Disputed Claims.

| DESCRIPTION/ CLASS | ESTIMATED AGGREGATE ALLOWED AMOUNTS | TREATMENT UNDER THE PLAN |
| --- | --- | --- |
| Unclassified: Priority Tax Claims | [To be determined] | Unimpaired.  Paid in full in cash on the Effective Date or receive other treatment agreed upon by the Debtors (in consultation with the Prepetition Collateral Agent) and the Holder.<br><br>Estimated Recovery: 100% |
| Unclassified: Administrative Expense Claims | $ 5,000.00 | Unimpaired.  Paid in full in cash or receive other treatment agreed upon by the Debtors (in consultation with the Prepetition Collateral Agent) and the Holder, except to the extent already paid.<br><br>Estimated Recovery: 100% |
| Class 1: Priority Non-Tax Claims | [To be determined] | Unimpaired.  Paid in full in cash or receive other treatment agreed upon by the Debtors (in consultation with the Prepetition Collateral Agent) and the Holder, except to the extent already paid.<br><br>Estimated Recovery: 100% |
| Class 2: Southwest Exchange Claims | $ 0.00 | Unimpaired.  No Distribution or payments of any kind.  In accordance with the Bankruptcy Settlement Order (defined herein), all Class 2 Claims will be deemed withdrawn or expunged.<br><br>Estimated Recovery: 0% |
| Class 3: Senior Lender Secured Claims | $ 57,071,384.00 | Impaired.  Receive Pro Rata share of the Distributable Cash.<br><br>Estimated Recovery: approximately 25% |

| DESCRIPTION/ CLASS | ESTIMATED AGGREGATE ALLOWED AMOUNTS | TREATMENT UNDER THE PLAN |
|---|---|---|
| Class 4: Senior Lender Deficiency Claims | $ 57,071,384.00 less amount of Distributable Cash | Impaired. Receive Pro Rata share of the Senior Lender Litigation Proceeds and the proceeds of the PIP PMA payable to Holders of Senior Lender Deficiency Claims.<br><br>Estimated Recovery: Speculative recoveries of Litigation Proceeds |
| Class 5: General Unsecured Claims | $4 million to $22 million | Impaired. Receive Pro Rata share (subject to the payment of the reasonable fees and expenses of the Liquidating Trustee) of the General Unsecured Cash Payment and the General Unsecured Creditors Litigation Proceeds and the proceeds of the PIP PMA payable to Holders of Allowed General Unsecured Claims.<br><br>Estimated Recovery: approximately 4.4% to 24.4% plus speculative recoveries of Litigation Proceeds |
| Class 6: Interdebtor Claims | $ 0.00 | Impaired. No Distribution or payments of any kind.<br><br>Estimated Recovery: 0% |
| Class 7: Non-Debtor Subsidiary Claims | $ 0.00 | Impaired. No Distribution or payments of any kind.<br><br>Estimated Recovery: 0% |

| DESCRIPTION/ CLASS | ESTIMATED AGGREGATE ALLOWED AMOUNTS | TREATMENT UNDER THE PLAN |
|---|---|---|
| Class 8: Equity Interests and Stock Claims | $ 0.00 | Impaired. No Distribution or payments of any kind. On the Effective Date, all Equity Interests shall be deemed canceled and of no force or effect and the Holders of Stock Claims shall not be entitled to receive or retain any property on account of such Claims. All rights or Claims of any holders of Equity Interests with respect to dividends, distributions, voting rights, liquidation preferences or presumptive rights to subscribe for securities, or other rights or Claims with respect to such Equity Interests, whether arising under applicable law, certificate(s) of incorporation, agreement or otherwise, also shall be deemed extinguished, canceled and of no force or effect on the Effective Date.<br><br>Estimated Recovery: 0% |

The Claim Amounts set forth in the above chart reflect the Debtors' estimates of the allowed claim amounts. The Estimated Aggregate Allowed Amounts have been adjusted to remove expunged, withdrawn, amended, duplicative, subordinated or subordinable, unsubstantiated, and otherwise disputed claims as well as reduce certain priority claims to the statutory limits set forth in Section 507(a)(4) of the Bankruptcy Code. The Debtors and the Liquidating Trust intend to object to such claims. The Debtors and the Liquidating Trust also intend to object to all proofs of claim that assert improperly classified claims, including but not limited to unsecured claims and equity interests asserted as priority claims. Additionally, the Debtors and the Liquidating Trust reserve all potential objections to any claims filed in the Chapter 11 Cases.

**NOTHING IN THE DISCLOSURE STATEMENT SHALL AFFECT THE RIGHTS OF THE DEBTORS, OR IN THE CASE OF GENERAL UNSECURED CLAIMS, THE LIQUIDATING TRUSTEE, TO OBJECT TO ANY PROOF OF CLAIM ON ANY GROUND OR FOR ANY PURPOSE IN ACCORDANCE WITH THE PROCEDURES SET FORTH IN THE PLAN.**

## III.  GENERAL INFORMATION

### A.     Overview of Chapter 11.

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11 of the Bankruptcy Code, a debtor is authorized to reorganize its business for the benefit of itself, its creditors and interest holders, as here, or to conduct an orderly liquidation of its assets to maximize asset recoveries.  Another goal of chapter 11 is to promote equality of treatment for similarly situated creditors and similarly situated interest holders with respect to the distribution of a debtor's assets.

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the filing date.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor-in-possession."

The consummation of a plan of reorganization or liquidation is the principal objective of a chapter 11 case.  A plan generally sets forth the means for satisfying claims against and interests in the debtor.  Confirmation of a plan by the Bankruptcy Court makes the plan binding upon the debtor, any issuer of securities under the plan, any person or entity acquiring property under the plan and any creditor of, or equity holder, in the debtor, whether or not such creditor or equity holder (a) is impaired under or has accepted the plan or (b) receives or retains any property under the plan.

After a plan of reorganization or liquidation has been filed in a chapter 11 case, certain holders of claims against or equity interests in a debtor are permitted to vote to accept or reject the plan.  Prior to soliciting acceptances of the proposed plan, Section 1125 of the Bankruptcy Code requires a plan proponent to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed decision whether to accept or reject the plan.  The Debtors are submitting this Disclosure Statement to holders of Allowed Claims and Equity Interests against each Debtor in order to satisfy the requirements of Section 1125 of the Bankruptcy Code.

### B.     Description of the Debtors' Business.

1.     <u>General.</u>

MediCor is a publicly held Delaware corporation with a number of wholly-owned, autonomous subsidiaries which operated as single business units across multiple geographic locations within the United States and internationally.  The Debtors and their non-debtor subsidiaries and affiliates (the "Non-Debtor Affiliates") were a global healthcare company that acquired, developed, manufactured and marketed products primarily for the aesthetic, plastic and reconstructive surgery and dermatology markets with annual aggregate net sales of $39.7 million for the calendar year ended December 31, 2006.  Historically, the Debtors and their Non-Debtor Affiliates reported the accounts of MediCor and all subsidiaries in which it maintains a controlling interest on a consolidated basis.

The primary product line of the Debtors and their Non-Debtor Affiliates was breast implants, which were manufactured and distributed exclusively outside the United States. In particular, the Debtors and their Non-Debtor Affiliates sold breast implants and other implant products in approximately 75 countries (other than the United States and Canada) through a combination of independent distributors worldwide and direct sales personnel in select countries. Breast and other implant products accounted for about 95% of total sales of the Debtors and their non-debtor subsidiaries and affiliates for the calendar year ended December 31, 2006, with the largest country, Brazil, accounting for about 19% of total breast implant sales. Based on publicly available data, MediCor estimates that, through its operating subsidiaries, it controlled approximately 17% of the worldwide breast implant market, excluding the United States.

As of the Petition Date, the Debtors employed four individuals, while their Non-Debtor Affiliates employed approximately 400 individuals, in the United States, France, Latin America, the United Kingdom and other countries.

2.      Company Organization and Corporate Structure.

(a)      Domestic Structure.

MediCor's domestic operations are conducted through its wholly-owned, domestic, Debtor subsidiaries.[2] Debtor III is a British Virgin Islands corporation that is a wholly-owned subsidiary of MediCor, and Debtor III USA is a British Virgin Islands corporation that is a wholly-owned subsidiary of III. Debtor MediCor Mgmt is a wholly-owned Delaware corporation and a subsidiary of III USA. Debtor MDC is a wholly-owned Delaware corporation and a subsidiary of III. Debtor MediCor Aesthetics is also a wholly-owned subsidiary of III and is incorporated in the State of Nevada. Debtor PIP.America is a Delaware corporation and a wholly-owned subsidiary of MediCor Mgmt. Debtor IPI is a Delaware corporation and a wholly-owned subsidiary of MDC.

III and III USA are holding companies and do not have any operations. MediCor Mgmt is a corporate shell entity that was organized to, among other things, be responsible for all of MediCor's overhead and administrative expenses. MDC was organized by MediCor for the purpose of prosecuting the Biosil PMA (defined below). MediCor Aesthetics is a dormant corporation with no operations that was organized by MediCor for the purpose of selling breast implants in the United States manufactured by Biosil. PIP.America was organized by MediCor for the purpose of prosecuting the PIP PMA (defined below). PIP.America ceased operations in or about April 2007. IPI is a holding entity for intellectual property owned by MediCor and its subsidiaries and has no operations.

(b)      Foreign Structure.

Prior to the sale of substantially all of the Debtors' assets (as described below), MediCor's primary foreign operating subsidiaries were non-debtors Eurosilicone SAS ("Eurosilicone"), which operated in France, and Biosil Ltd. ("Biosil") and Nagor Ltd. ("Nagor"), both of which operated in the United Kingdom. Substantially all of the sales of the Debtors and

---

[2] A copy of the corporate chart of MediCor Ltd. and its affiliates and subsidiaries is attached hereto as Exhibit D.

their Non-Debtor Affiliates were derived from the international operations of Eurosilicone, Biosil and Nagor (collectively, the "European Operating Entities"). Eurosilicone was a wholly-owned direct subsidiary of non-debtor ES Holdings SAS ("ES Holdings"), which in turn was a wholly-owned direct subsidiary of MediCor Europe Holdings ApS ("Europe ApS"). Europe ApS was a wholly-owned direct subsidiary of MediCor. Biosil and Nagor were wholly-owned direct subsidiaries of Biosil UK Limited ("Biosil UK"), which is in turn was a direct subsidiary of MediCor.

MediCor's breast and other implant products were produced by Eurosilicone and Biosil and were primarily distributed through independent distributors. However, MediCor also sold some of its Nagor and Eurosilicone products directly to hospitals, surgical centers and physicians through direct sales personnel employed by certain of its Non-Debtor Affiliates. Specifically, Eurosilicone sold or intended to sell its products through other MediCor affiliates including MediCor Deutschland GmbH ("MediCor Germany"), MediCor Aesthetics UK Limited ("MAUK"), MediCor Australia Pty. Limited ("MediCor Australia"), and MediCor Latin America S.A. de C.V. ("MLA"). MediCor Germany and MLA sold Eurosilicone products since their inceptions but MAUK and MediCor Australia never commenced operations.

MediCor Germany was established in 2006 in order to be a direct distributor of Eurosilicone products in Germany. Currently, MediCor Germany is in the process of closing. MLA was established by MediCor in 2004 in order to serve as a marketing and distribution channel for Eurosilicone products in Mexico, as well as Central and South America. MLA's operations are currently dormant. Dermatological Medical Products and Specialties S.A. de C.V. ("MediCor Mexico") and MediCor Services Company S.A. de C.V. ("MediCor Services") are management entities which support MLA's operations and are direct subsidiaries of MLA. MediCor Mexico and MediCor Services are also currently dormant.

MediCor Europe B.V. ("MEBV") is a holding company for MediCor Germany and is a wholly-owned direct subsidiary of Europe ApS. MediCor Asia-Pacific ("MAP") is a holding company for MediCor Australia and is a direct subsidiary of MediCor. MLA and MAUK are direct subsidiaries of MediCor. International Integrated Europe Ltd. ("III Europe") is a non-debtor, wholly-owned, British Virgin Islands corporation and a direct subsidiary of III. III Europe is a shell corporation with no operations or assets. It was originally created to serve as a holding company for all of MediCor's European assets, but was never used for this purpose.

## C.     History and Nature of the Debtors' Business.

Founded in 1999 by Donald K. McGhan ("McGhan"), MediCor's objective was to be a leading integrator of select international medical devices and technologies. MediCor pursued this growth through the expansion of existing product lines and offerings and through the acquisition of companies and other assets, including intellectual property rights and distribution rights. As noted above, the primary product line of MediCor and its affiliates was breast implants.

In July 2004, MediCor, through its indirect wholly-owned subsidiary, ES Holdings, acquired all of the capital stock of Eurosilicone, a French based privately-held manufacturer of breast implants and other medical devices, for $43,297,915 plus certain subsequent performance

payments to the previous shareholders of Eurosilicone in connection with revenue targets.[3] The financing of this acquisition was provided primarily by loans from International Integrated LLC ("International Integrated"), a company controlled by McGhan, MediCor's former Chairman and largest shareholder.

By its purchase of Eurosilicone, MediCor acquired the manufacturing capacity to market breast implants throughout the world, subject only to regulatory constraints. Eurosilicone employed approximately 240 individuals in its facilities located in Apt, France. In addition to breast implants, Eurosilicone manufactured a broad line of other implant products targeted for the aesthetic, plastic and reconstructive markets, including gluteal, calf, pectoral, malar and testicular implants, as well as external breast prosthesis. These additional products collectively accounted for approximately 4% of the total sales of the Debtors and their Non-Debtor Affiliates.

On April 28, 2006, MediCor, through its wholly-owned subsidiary, Biosil UK, acquired privately owned United Kingdom based breast implant manufacturer Biosil and related supplier Nagor for a combined purchase price of £20 million (approximately, U.S. $32.7 million) plus subsequent payments of £6.5 million and 2.64 million shares of MediCor common stock. The purchase of Biosil and Nagor was financed primarily through the private placement of senior secured convertible notes and warrants.

Biosil developed and manufactured, and Nagor marketed, a full range of silicone implants for the aesthetic, plastic and reconstructive surgery markets, including silicone gel and saline-filled breast implants. Biosil also manufactured a range of other silicone devices, including tissue expanders, testicular implants, gluteal implants, calf implants, facial implants and a range of scar management products and has developed innovative products within the anesthesia and colorectal disciplines. Biosil employed approximately 95 persons in its two manufacturing facilities. Nagor employed approximately 35 persons and supplied the breast implant and associated products manufactured by Biosil to customers in approximately 60 countries throughout Europe, Asia, Central and South America and Africa.

1.    The Biosil PMA.

In addition to their foreign operations, the Debtors attempted to gain entry into the United States saline-filled breast implant market, relying in part upon MediCor's acquisition of Biosil. In 2001, Debtor MDC commenced prosecution of a pre-market approval ("PMA") application with the United States Food and Drug Administration (the "FDA") to market and distribute Biosil's saline-filled breast implants in the United States (the "Biosil PMA"). The FDA's approval of the Biosil PMA was necessary to provide regulatory clearance for the Debtors to market and distribute the approved saline-filled breast implants in the United States.

The ability to market medical devices in the United States is controlled by the FDA. Based upon the degree of control necessary to assure that various types of devices are safe and effective, the Medical Device Amendments of 1976 to the Federal Food, Drug, and Cosmetic

---

[3] The following subsequent performance payments were made: a payment of € 2,978,041.01 by ES Holdings in March 2005; a payment of € 2,564,903.85 by MediCor in April 2006; and a payment of € 2,421,658.68 by ES Holdings in April 2007.

Act established three regulatory classes for medical devices. Breast implants are in the most regulated class (Class III), which is subject to strict PMA requirements. Pre-market approval is the FDA process of scientific and regulatory review to evaluate and ensure the safety and effectiveness of Class III medical devices. The FDA will only approve a PMA application if it contains sufficient valid scientific evidence to ensure that the subject device is safe and effective for its intended use(s). The PMA requirement is the most stringent type of device marketing application required by the FDA, and an approved PMA application is, in effect, a private license granting the applicant (or owner) permission to market the device.

The Biosil PMA was submitted in 2001 in a format in which separate components, or modules, of the application were submitted for review by the FDA. Subsequently, the Debtors engaged in clinical trials, clinical data collection and related regulatory efforts in support of the Biosil PMA. The submission was converted to a regular PMA application in 2002. The Biosil PMA was funded from the Debtors' general working capital as part of their ongoing research and development efforts. Discussions with the FDA regarding the submission of final clinical data and a final amendment to the Biosil PMA continued both before and after the Petition Date.

As discussed below, the Bankruptcy Court approved the sale of assets related to the Biosil PMA by Order dated April 23, 2008. [Docket No. 502]. The sale of the assets closed on May 30, 2008.

      2.     The PIP PMA.

The Debtors' attempt to gain entry into the United States saline-filled breast implant market also relied in part upon Debtor PIP.America's distribution agreement with Poly Implant Prostheses, S.A. ("PIP France"), an independent manufacturer of breast implants based in France, for the sale of PIP France's pre-filled saline breast implant products in North America. PIP.America does not have any sales because these products are not currently approved for distribution in North America.

On or about March 30, 2004, PIP France and PIP.America entered into an Amended and Restated Non-Exclusive Distribution Agreement concerning the distribution of PIP France manufactured breast implants and certain related matters, including the filing and prosecution of a separate PMA application for PIP France's breast implants (the "PIP PMA"). On that date and in connection with the amended distribution agreement, PIP France executed and delivered a 6.75% Revolving Promissory Note to PIP.America in the principal amount of $1,657,675 (the "Promissory Note"). The Debtors claim that PIP France owes the Debtors not less than $4.4 million in connection with the Promissory Note (the "Note Claim").

On or about December 3, 2007, PIP France filed a proof of claim against MediCor Ltd. in an amount of not less than $28.7 million ("Claim No. 275") and filed a proof of claim against PIP.America in an amount of not less than $28.7 million ("Claim No. 276" and together with Claim No. 275, the "PIP France Filed Claims"). In Claim No. 276, PIP France asserted damages in connection with PIP.America's alleged failure to make minimum purchases under the amended distribution agreement and potential damages in connection with PIP.America's alleged failure to obtain the PMA. In Claim No. 275, PIP France asserts the same damages against MediCor Ltd. on an alter ego theory.

On April 28, 2009, PIP France commenced a voluntary proceeding for reorganization, or a *procedure de sauveguarde*, under French law in the Commercial Tribunal of Toulon, France (the "French Court"). Mr. Xavier Huertas was appointed by the French Court as receiver of PIP France on May 4, 2009.

In order to avoid the costs and risks of litigation, the Debtors and PIP France determined to resolve their disputes pursuant to a mutual release of any and all claims that the Debtors have or may have against PIP France (including without limitation the Note Claim) and any and all claims that PIP France has or may have against the Debtors (including without limitation the PIP France Filed Claims). The Debtors have determined that such a settlement is fair and reasonable and a sound exercise of the Debtors' business judgment. A motion to approve the settlement pursuant to section 105 of the Bankruptcy Code and Bankruptcy Rule 9019 was filed by the Debtors on February 5, 2010, and a hearing on the motion was scheduled before the Bankruptcy Court for February 25, 2010, at 11:30 a.m.

Under the Plan, all of the Debtors' rights, title, and interests in the PIP PMA will be transferred to the Liquidating Trust.

**D.      The Debtors' Capital and Debt Structure.**

As of the Petition Date, the Debtors had outstanding aggregate secured debt totaling approximately $61,800,000 (plus $11,982,760 of accrued interest and registration penalties) and outstanding aggregate unsecured debt of approximately $80.9 million.[4]

The Debtors and their Non-Debtor Affiliates historically raised funds to support their operating expenses and capital requirements through sales of equity or debt securities, as well as borrowings from International Integrated on an unsecured basis. Indeed, until the April 2006 secured financing transactions described below, McGhan and his affiliates provided a substantial portion of the funds to support the Debtors' and their Non-Debtor Affiliates' operations. In addition, International Integrated had committed to fund the operating expenses and capital expenditures of the Debtors and their Non-Debtor Affiliates through July 1, 2007 (the "Funding Commitment").

1.      The Senior Lender Notes.

On April 26, 2006, MediCor entered into a Securities Purchase Agreement (the "Securities Purchase Agreement"), with Silver Oak Capital, L.L.C., in its capacity as collateral agent (the "Prepetition Collateral Agent"), and, as purchasers thereunder, Silver Oak Capital, L.L.C., HFTP Investment L.L.C. (which has since dissolved), GAIA Offshore Master Fund, Ltd. (now known as Promethean I Master Ltd.) and Portside Growth and Opportunity Fund and the other note purchasers party thereto from time to time (with Promethean II Master, L.P., certain assigns and successors of HFTP Investment L.L.C., and all past and future assigns of the above entities, the "Senior Lenders"). Pursuant to the terms of the Securities Purchase Agreement, MediCor issued to the Senior Lenders senior secured convertible notes (the "Senior Lender

---

[4] Nothing contained in this Disclosure Statement constitutes an admission or acknowledgment that any claims described and identified herein are valid, enforceable, allowable, or not subject to disputes, counterclaims, or offsets.

Notes") in an original aggregate principal amount of $50 million. As part of this financing transaction, MediCor also issued warrants to purchase shares of its common stock. Twenty-five million dollars of the proceeds from this transaction were utilized for the acquisition of Biosil and Nagor, with the remaining balance made available for general working capital needs.

The Senior Lender Notes are secured by substantially all of MediCor's assets, including, without limitation, its equity interests in various direct subsidiaries, and the assets of III, MediCor Mgmt, MediCor Aesthetics, MDC, PIP.America, HPL Biomedical Inc. ("HPL Biomedical") and IPI (collectively, the "Guarantors") pursuant to a Guarantee and Collateral Agreement dated April 26, 2006, by and among MediCor and the Guarantors in favor of the Collateral Agent, for the benefit of the Collateral Agent, the holders of the Senior Lender Notes and the other secured parties referred to therein (the "Guarantee and Collateral Agreement"). MediCor also pledged 65% of the capital stock of two non-Debtor foreign subsidiaries, among others, MLA and Europe ApS, to secure the obligations of MediCor and the Guarantors.

The Senior Lender Notes and warrants were also subject to a Registration Rights Agreement dated as of April 26, 2006, that required MediCor to register the underlying shares with the Securities and Exchange Commissions ("SEC") and maintain the effectiveness of the registration statement.

2.    Amendments to the Securities Purchase Agreement.

On January 30, 2007, in response to certain defaults under the Securities Purchase Agreement and Senior Lender Notes, (collectively, with any related transactions or ancillary document the "Senior Loan Documents"), MediCor and the Guarantors entered into an Amendment to Certain Transaction Documents dated as of January 30, 2007 ("Amendment No. 1"), with the Collateral Agent and the Senior Lenders. In connection with Amendment No. 1, and as a result of certain defaults by MediCor and the Guarantors under the Senior Loan Documents, the Senior Lenders exercised their right to increase the principal balance of the Senior Lender Notes by 20%, or $10 million, to $60 million. In addition, pursuant to the terms of Amendment No. 1, the Senior Lenders agreed, *inter alia*, to loan MediCor an additional $800,000 under the Senior Lender Notes. MediCor agreed to use the proceeds of these additional advances to fund payroll expenses, pay the fees of Alvarez & Marsal (defined below) and pay certain other expenses. As a result, the aggregate principal amount due under the Senior Lender Notes was increased to $60.8 million. Amendment No. 1 further amended the Senior Lender Notes such that the remaining 35% of the capital stock of MLA and Europe ApS were pledged to secure the obligations of MediCor and the Guarantors under the Senior Loan Documents. Additionally, pursuant to Amendment No. 1, the Senior Lenders agreed to purchase certain promissory notes from Eurosilicone in an aggregate initial outstanding principal amount of $700,000 (as discussed below).

On March 21, 2007, MediCor and the Guarantors entered into a second Amendment to Certain Transaction Documents ("Amendment No. 2"), with the Prepetition Collateral Agent and the Senior Lenders. Pursuant to Amendment No. 2, the Senior Lenders agreed to loan MediCor an additional $200,000 under the Senior Lender Notes. As a result of these increases, the aggregate principal amount of the Senior Lender Notes became $61 million.

The Securities Purchase Agreement and the related transaction documents were amended again on March 30, 2007, when MediCor and the Guarantors entered into a Third Amendment to Certain Transaction Documents dated as of March 30, 2007 ("Amendment No. 3"), with the Prepetition Collateral Agent and the Senior Lenders. Pursuant to Amendment No. 3, the Senior Lenders agreed to lend $3,500,000 to MediCor's subsidiary, ES Holdings, under promissory notes issued by ES Holdings (the "ES Holdings Notes") (discussed below). MediCor and the Guarantors also amended the Guarantee and Collateral Agreement to include the ES Holdings Notes as guaranteed obligations under that Agreement.

On May 25, 2007, MediCor and the Guarantors entered into a Fourth Amendment to Certain Transaction Documents ("Amendment No. 4"), with the Prepetition Collateral Agent and the Senior Lenders. Pursuant to Amendment No. 4, the Senior Lenders agreed to loan MediCor an additional $300,000 under the Senior Lender Notes. As a result of these increases, the aggregate principal amount of the Senior Lender Notes became $61.3 million.

On June 22, 2007, MediCor and the Guarantors entered into a Fifth Amendment to Certain Transaction Documents ("Amendment No. 5"), with the Prepetition Collateral Agent and the Senior Lenders. Pursuant to Amendment No. 5, the Senior Lenders agreed to loan MediCor an additional $500,000 under the Senior Lender Notes. As a result of these increases, the aggregate principal amount of the Senior Lender Notes became $61.8 million.

3.    The Eurosilicone Notes.

As noted above, pursuant to Amendment No. 1, on January 30, 2007, the Senior Lenders loaned $700,000 to Eurosilicone evidenced by promissory notes (the "Eurosilicone Notes"). The Eurosilicone Notes are guaranteed by MediCor and the Guarantors and are secured by the liens granted to the Prepetition Collateral Agent on the terms set forth in Amendment No. 1. On February 13, 2007, Eurosilicone and the Senior Lenders amended the Eurosilicone Notes to extend the maturity of the promissory notes to June 29, 2007. As of the Petition Date, the aggregate principal amount of the Eurosilicone Notes was approximately $746,334 and the accrued interest was approximately $46,027.

4.    The ES Holdings Notes.

As noted above, pursuant to Amendment No. 3, on March 30, 2007, the Senior Lenders loaned $3,500,000 to ES Holdings evidenced by the ES Holdings Notes. The ES Holdings Notes are guaranteed by MediCor and the Guarantors and are secured by the liens granted to the Prepetition Collateral Agent on the terms set forth in Amendment No. 3. As of the Petition Date, the aggregate principal amount of the ES Holdings Notes was approximately $3,641,151 and the accrued interest was approximately $139,616.

5.    The Sirius and International Integrated Unsecured Notes.

Until April 26, 2006, International Integrated held an unsecured promissory note (revolving debt payable upon demand) of MediCor (the "Integrated Note"). As of April 26, 2006, approximately $68,539,186.11 was owed under the Integrated Note. On that date, the Integrated Note was split into two unsecured notes, one for $37,500,000 in favor of Sirius Capital LLC ("Sirius") and one for $31,039,186.11 in favor of International Integrated, and the

Integrated Note was indefeasibly paid in full. Sirius is a private equity investment fund controlled by certain members of the McGhan family. Also on April 26, 2006, each of these new promissory notes was amended and restated; one to an Amended and Restated Subordinated Convertible Note in favor of Sirius (the "Sirius Note") and the other to an Amended and Restated Subordinated Promissory Note in favor of International Integrated (the "International Integrated Note"). As part of this transaction, MediCor issued a warrant to Sirius to purchase shares of MediCor's common stock.

International Integrated and Sirius are the Debtors' two largest unsecured creditors. As of the Petition Date, (i) the aggregate principal amount of the International Integrated Note was $33,294,589.54 and the accrued interest was $1,651,046.77 and (ii) the aggregate principal amount of the Sirius Note was $37,500,000 and the accrued interest was $5,048,995.56. In May 2007, Sirius and International Integrated were placed under the custody and control of the court-appointed receiver, Larry L. Bertsch (the "Receiver"), in the action pending in the Eighth Judicial District Court in Clark County, Nevada entitled *In re Receivership of Southwest Exchange, Inc. and Consolidated Litigation* (discussed below). The International Integrated Note and the Sirius Note are expressly subordinate and junior in right to payment of the Senior Lender Notes. As discussed herein, the claims of International Integrated and Sirius, as well as all the related claims of the Southwest Exchange entities and their customers, will be expunged pursuant to the Receiver Settlement Agreement assuming the Southwest Exchange Settlement Orders are obtained, and the Receiver Settlement Amount has been paid to the Receiver as Settlement Trustee.

6.      Other Unsecured Debt.

As of the Petition Date, the Debtors had aggregate unsecured debt other than inter-company debt and that owed to International Integrated and Sirius of approximately $4.1 million. This debt includes, but is not limited to, trade payables, accrued wages and unpaid leave, and product replacement claims.

Filed and scheduled General Unsecured Claims have a face amount of $421,025,595. Of this amount, the majority of filed General Unsecured Claims related to the Southwest Exchange dispute. Pursuant to the Southwest Exchange Settlement, at least $306,707,209 in such General Unsecured Claims will be released and, per the Plan, are to be expunged. In addition, the General Unsecured Claims reconciliation process proposed in the Plan, will reduce duplicate, subordinated or subordinable, unsubstantiated, and otherwise disputed General Unsecured Claims, including, without limitation, those General Unsecured Claims asserted by Poly Implant Prosthese, S.A. ("PIP France"), Ted Lower, and the Kwartin family. The reconciliation process may yield the aforementioned $4.1 million General Unsecured Claim pool and it may yield a higher or lower aggregated Class 5 pool under the Plan. All filed or scheduled General Unsecured Claims are subject to objection or other contest or offset (except as such Claims are expressly Allowed under the Plan) both before and after the occurrence of the Effective Date under the Plan. Holders of General Unsecured Claims subject to the reconciliation process may contest such objections, contests and offsets on various grounds.

7.     Shareholder Equity.

As of September 26, 2006, MediCor had approximately 560 stockholders of record and 23,746,162 shares of common stock were outstanding (the "Common Stock"). MediCor's Common Stock, publicly held under the ticker symbol "MDCR.PK", has been delisted from NASDAQ and currently trades, to the extent trades are made, as an Other OTC security. Additionally, as of September 26, 2006, MediCor had approximately 31 stockholders of record with respect to its Series A Preferred Stock and 6,456 shares of Series A Preferred Stock were outstanding.

**E.     Events Leading to the Debtors' Chapter 11 Filings.**

The Debtors have experienced sustained losses since their inception. For the fiscal year ended June 30, 2005, the Debtors and their Non-Debtor Affiliates reported net sales of approximately $26.9 million and a net loss of approximately $17.3 million. For the fiscal year ended June 30, 2006, the Debtors and their Non-Debtor Affiliates reported net sales of approximately $31.4 million, and a net loss of approximately $18.5 million. The Debtors and their Non-Debtor Affiliates reported net sales of approximately $9.5 million, and a net loss of approximately $12.8 million for the first quarter ended September 30, 2006, and preliminarily reported net sales of approximately $11.7 million and a net gain of approximately $2.3 million for the second quarter ended December 31, 2006.[5]

In addition to their sustained losses and financial difficulties, on January 24, 2007, the Debtors lost their major source of working capital funding when Donald K. McGhan resigned from his positions as Chairman and director of MediCor, and International Integrated terminated its commitment to fund operating expenses and capital expenditures of the Debtors through July 1, 2007 (the "Funding Commitment"). Prior to his resignation, the Debtors relied extensively and exclusively on McGhan for capital funding, management direction and strategic planning. McGhan's resignation occurred amid allegations that he misdirected more than $80 million in funds belonging to companies under his control, but otherwise unrelated to MediCor, to other companies, including MediCor. These allegations were the basis for a number of lawsuits that name MediCor as a defendant.

On March 7, 2007, MediCor was named as a co-defendant in the First Amended Complaint in *Sorrell v. Southwest Exchange, Inc., et al.* (the "Sorrell Complaint"), a class action lawsuit filed in the Superior Court of the State of California for the County of Santa Barbara, Case No. 1243550 (the "Sorrell Action").[6] The Sorrell Complaint was filed by investors who deposited funds with certain like-kind property exchange facilitators and qualified intermediaries under 26 U.S.C. §1031, including Southwest Exchange Inc. ("Southwest Exchange") in order to facilitate the plaintiffs' respective 1031 tax-deferred exchanges. The Sorrell Complaint alleges, among other things, that at the instruction of McGhan, who was the President and Chairman of

---

[5] MediCor did not timely file a Form 10-Q with the SEC for the quarter ended December 31, 2006 and has not filed any subsequent quarterly or annual reports with the SEC.

[6] The Sorrell Action was subsequently removed to the United States District Court for the Central District of California, C.A. No. 2:07-2088, and, on October 18, 2007, was transferred by order of the United States Judicial Panel on Multidistrict Litigation to the United States District Court for the District of Nevada.

the Board of Directors of Southwest Exchange, exchange funds that were deposited with Southwest Exchange were improperly transferred to the Debtors to fund their operations and to purchase Eurosilicone. The Sorrell Complaint further alleges that MediCor and other defendants, *inter alia*, were involved in the creation and maintenance of a racketeering enterprise in violation of Civil RICO, 18 U.S.C. § 1962(c), engaged in a conspiracy to commit Civil RICO violations, assisted in theft, conversion and embezzlement of funds, received stolen property, and engaged in and assisted in a breach of fiduciary duty.

On April 27, 2007, MediCor was named as a co-defendant in the "First Amended Complaint in Intervention" filed by Milan Selakovic, Cynthia Selakovic and Dee Wamsley (the "Selakovic Complaint"), in the consolidated litigation entitled *In re Receivership of Southwest Exchange, Inc. and Consolidated Litigation*, Case No. A535439 (the "Receivership Proceeding"), pending in the Eighth Judicial District Court, Dept. No. XI, in Clark County, Nevada. The Receivership Proceeding involves multiple lawsuits filed against Southwest Exchange and others by plaintiffs who engaged Southwest Exchange to act as a qualified intermediary and facilitate like-kind property exchanges pursuant to 26 U.S.C. § 1031. On May 3, 2007, MediCor was named as a co-defendant in the "Master Complaint and First Amended Complaint of Napa Valley Plaintiffs" (the "Master Complaint") filed in the Receivership Proceeding. The allegations against MediCor set forth in the Selakovic Complaint and in the Master Complaint are substantially the same as those set forth in the Sorrell Complaint.

In view of these events, and cognizant of the need to restructure their balance sheet and address the liquidity crisis caused by their operating losses, McGhan's resignation, and the termination of the Funding Commitment, the Debtors initiated steps to develop possible restructuring plans or strategic alternatives. On January 29, 2007, the Debtors retained Alvarez & Marsal North America, LLC ("Alvarez & Marsal") as their restructuring advisor and Dennis E. Stogsdill of Alvarez & Marsal as their Chief Restructuring Officer. Immediately upon being engaged, Alvarez & Marsal began working with the Debtors to devise various restructuring alternatives that could be implemented in, or outside of, a chapter 11 bankruptcy case.

After assessing these alternatives, the Debtors determined that a sale of their businesses would most likely best preserve and maximize the value of their estates for the benefit of their creditors. Accordingly, on or about February 1, 2007, the Debtors and Alvarez & Marsal commenced a comprehensive and thorough pre-petition marketing and sale process in order to elicit interest in the sale of the Debtors' assets and businesses, including, most significantly, the businesses of the European Operating Entities and the Biosil PMA and related assets of MDC (the "PMA-Related Assets"). This process included contacting a broad group of over 70 strategic, venture capital, and financial buyers in Europe and North America. After executing confidentiality agreements, twenty-nine prospective buyers were provided with preliminary confidential information materials. Subsequently, fifteen indications of interest from prospective buyers were received, and additional confidential information materials, including a detailed financial forecast model, were distributed to those parties. Additionally, the Debtors and representatives of the European Operating Entities offered to participate in conference calls with each prospective buyer to review information and answer questions.

Prospective buyers were given the option of bidding on the Debtors' entire asset group or individual businesses. Five parties submitted preliminary non-binding proposals to purchase

some or all of the Debtors' European Operating Entities. Upon the receipt of preliminary bids in May and early June 2007, prospective buyers were provided with management presentations in the United States and Europe, tours of production facilities, and additional due diligence materials. Prospective buyers were asked to reaffirm their bids on or before June 18, 2007, subject only to legal and accounting due diligence. Thereafter, reaffirming bids were received for the purchase of some or all of the European Operating Entities.

Additionally, during this time frame, Alvarez & Marsal embarked upon efforts to improve the overall profitability of MediCor and its subsidiaries to better position them for a potential sale. These performance improvement initiatives included, but were not limited to, downsizing unproductive or unnecessary overhead positions and locations, eliminating unprofitable product lines and subsidiaries, overhauling ineffective marketing programs, converting inefficient or capital intensive direct sales organizations to independent distributorships, renegotiating unprofitable legacy customer pricing arrangements, scaling down excess manufacturing capacity and reducing non-priority capital spending projects. In furtherance of its efforts to stabilize the businesses, Alvarez & Marsal also assessed the various relationships, both financially and structurally, among MediCor and its subsidiaries.

The Debtors also explored strategic alternatives to resolve their liquidity situation with the Senior Lenders and entered into the various loan amendments discussed above whereby the Senior Lenders consistently funded the Debtors' working capital needs in the United States and abroad in order to preserve their businesses in anticipation of a sale. The Debtors instituted multiple liquidity preservation measures, including the reduction of domestic payroll needs from $330,000 to $55,000 per month through the use of deferred compensation packages for management and employees, laying-off the majority of staff in the Debtors' Las Vegas and Santa Barbara locations, closing the Debtors' Las Vegas headquarters, negotiating with vendors and landlords to defer payments, collecting due and overdue balances more aggressively, refining the definition of critical payments while accelerating certain payments, eliminating free product programs, placing long term expenditures on hold, and overseeing disbursements programs.

Alvarez & Marsal's efforts to increase liquidity and focus on the Debtors' core business also resulted in the sale of certain other assets. On February 22, 2007, MediCor's subsidiary, HPL Biomedical, which sold scar management products under the name Biodermis, completed a disposition of substantially all of its assets for a total purchase price of approximately $618,000, of which $55,000 was cash and the balance was other consideration.

On June 26, 2007, the Debtors, in consultation with Alvarez & Marsal, selected bidders to enter into exclusive negotiations with and potentially serve as stalking horse bidders for the Debtors' assets.[7] The Debtors commenced their chapter 11 cases to effectuate the orderly marketing and sale of their businesses in a manner designed to preserve and maximize value.

---

[7] As part of their pre-petition marketing and sale process, on April 2, 2007, the Debtors also entered into a letter of intent with a prospective purchaser of the PMA-Related Assets that provided for, *inter alia*, an exclusive negotiation period. However, that exclusive period expired and did not result in a stalking horse bid for the PMA-Related Assets.

# IV.  EVENTS DURING THE CHAPTER 11 CASES

On the Petition Date, the Debtors filed voluntary petitions for reorganization under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the District of Delaware.  The Debtors' bankruptcy cases have been assigned to United States Bankruptcy Judge Mary F. Walrath and have been administratively consolidated under case number 07-10877 (MFW).

The following is a brief description of certain major events that have occurred during the Chapter 11 Cases.

## A.    Continuation of Business After The Petition Date.

1.    _Transition Motions._  Shortly after the Petition Date, the Debtors filed a number of motions with the Bankruptcy Court, seeking various forms of relief that the Debtors deemed essential to facilitating their transition into chapter 11.  Among the orders sought by the Debtors were, without limitation, the following:

> (a)    an order directing joint administration of the Debtors' chapter 11 cases;

> (b)    an order authorizing the Debtors to maintain their bank accounts and continue the use of their business forms and granting a waiver of the deposit guidelines set forth in Section 345 of the Bankruptcy Code; and

> (c)    an order authorizing, but not requiring, the Debtors to pay, on an emergency basis, the pre-petition claims of certain critical service providers.

2.    _Retention Applications._    Shortly after the Petition Date, the Debtors also requested authorization to retain Lowenstein Sandler PC as general bankruptcy counsel and Greenberg Traurig, LLP as Delaware counsel to represent the Debtors in their chapter 11 cases. Additionally, the Debtors filed a motion to approve the employment of Alvarez & Marsal as their restructuring advisor and Dennis E. Stogsdill of Alvarez & Marsal as their Chief Restructuring Officer.

3.    _Interim Compensation Procedures._  On August 15, 2007, the Bankruptcy Court entered an Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals Pursuant to 11 U.S.C. §§ 105(a) and 331 (the "Interim Compensation Order").  The Interim Compensation delineates a procedure for the: (i) filing of interim fee applications by all professionals retained in the Debtors' bankruptcy cases; (ii) filing of objections to interim fee applications; and (iii) payment by the Debtors of fees and reimbursement of expense to Professionals

4.    _Appointment of Claims, Noticing and Balloting Agent_.  On October 27, 2008, the Bankruptcy Court entered an order authorizing the Debtors' retention of Epiq Bankruptcy Solutions, LLC as claims, noticing and balloting agent for their Chapter 11 cases.

**B. Appointment of a Creditors' Committee.**

On July 13, 2007, the Office of the United States Trustee (the "U.S. Trustee") appointed the Official Committee of Unsecured Creditors (the "Committee") to represent the interests of unsecured creditors of the Debtors. The original members of the Committee were as follows: (i) Merrill Communications LLC; (ii) Receiver for Southwest Exchange, Inc. (Larry L. Bertsch); (iii) Harry A. Springer, M.D.; (iv) Anabase International Corporation; and (v) Jon and Marie Sorrell Trust. As described below, on December 17, 2007, the Receiver resigned from the Committee. The Jon and Marie Sorrell Trust subsequently resigned from the Committee.

Shortly after its formation, the Committee applied for Bankruptcy Court authorization to retain Blank Rome LLP as its counsel and NachmanHays Brownstein, Inc. as its financial advisors.

Since the Committee's formation, the Debtors have consulted with the Committee concerning the administration of the Chapter 11 Cases and have kept the Committee informed of their operations.

**C. Post-Petition Secured Financing.**

In order to obtain sufficient liquidity to operate their businesses and maximize their value and to effectively manage their financial affairs throughout their chapter 11 cases, the Debtors negotiated a post-petition financing arrangement (the "DIP Loans") with the Senior Lenders (in their capacity with respect to the DIP Loans, the "Post-Petition Lenders"). On the Petition Date, the Debtors filed a motion for an order approving their entry into the DIP Loans and for associated relief (the "DIP Financing Motion"). [Docket No. 9]. On July 13, 2007, the Bankruptcy Court entered an interim order (the "Interim DIP Order") granting the relief sought by the DIP Financing Motion on an interim basis. [Docket No. 57]. The Interim DIP Order authorized the Debtors' entry into the DIP Loans, grant of liens, security interests and superpriority claims to the Post-Petition Lenders, use of the Senior Lenders' cash collateral and provision of adequate protection to the Senior Lenders for such use of cash collateral. On August 28, 2007, the Bankruptcy Court entered an order granting the relief sought by the DIP Financing Motion on a final basis (as amended, the "Final DIP Order"). [Docket No. 165].

In addition to approving the DIP Financing Facility, the Final DIP Order granted the Committee, on the terms set forth therein, standing to investigate and challenge the perfection of the Senior Lenders' prepetition security interests, liens, charges and claims with respect to and in connection with the Prepetition Obligations and the Prepetition Documents. Paragraph 21 of the Final DIP Order provides that "any complaint seeking to object to, contest or raise any defense to the perfection of the Prepetition Liens must be filed with the [Bankruptcy] Court by no later than October 1, 2007 (or such later date as shall be agreed to by the Prepetition Collateral Agent or so ordered by the [Bankruptcy] Court for cause shown)." The deadline referenced in the foregoing sentence, but only as to the Committee, is hereinafter referred to as the "Perfection Challenge Deadline".

Paragraph 21 of the Final DIP Financing Order further provides that:

> Any party in interest, other than the Debtors, but including the Committee, shall have until March 3, 2008 (or such later date as shall be agreed to by the Prepetition Collateral Agent or so ordered by the [Bankruptcy] Court for cause shown) to file a complaint with the [Bankruptcy] Court pursuant to Bankruptcy Rule 7001, seeking to invalidate or otherwise challenge the Prepetition Financing Documents, the Prepetition Liens and/or the Prepetition Indebtedness, on any grounds other than the failure to perfect the Prepetition Liens.

The deadline referenced in the foregoing sentence, but only as to the Committee, is hereinafter referred to as the "Other Challenge Deadline". Any available grounds to challenge the liens and claims of the Senior Lenders are referred to herein as the "Available Challenges". By agreement of the Prepetition Collateral Agent, the Perfection Challenge Deadline was extended for the Committee through and including January 31, 2010, and the Other Challenge Deadline was extended for the Committee through and including February 28, 2010. The Committee has reviewed issues relating to the perfection of the Senior Lenders' asserted security interests, liens, charges and claims, and has investigated the claims, liens and rights asserted by and claims and rights against the Senior Lenders, including, without limitation, through informal discovery with the Debtors and the Senior Lenders.

Subsequent to the Debtors' sale of substantially all of their assets and the sale of the assets of certain of their non-debtor subsidiaries, as discussed below, the DIP Facility was terminated and the loans and other extensions of credit made thereunder in the amount of $4,093,072.89 were paid in full on June 5, 2008. However, the terms and conditions of the Final DIP Order with respect to the use of Cash Collateral remained and continue to remain in full force and effect, subject to the terms and conditions of the order approving the Sale and subject to the terms of a stipulation entered into pursuant to the Receiver Settlement (as defined below) regarding the use of certain escrowed funds.

**D.      The Debtors' Schedules and the Statements of Financial Affairs.**

On August 2, 2007, the Debtors filed their schedules of assets and liabilities (the "521 Disclosure Schedules") and statements of financial affairs with the Bankruptcy Court. On December 20, 2007, Debtors MediCor, MDC, and PIP.America filed certain amendments to their schedules pursuant to Bankruptcy Rule 1009(a). As of December 20, 2007, the Debtors' 521 Disclosure Schedules reflect the following:

<u>MediCor</u>
Secured Claim of the Senior Lenders: $78,101.761.02
Priority Claims: $98,748.31
Unsecured Claims: $79,395,138.73

<u>III</u>
Secured Claim of the Senior Lenders: $78,101.761.02
Priority Claims: None
Unsecured Claims: $10,109,565.02

III USA
Secured Claim of the Senior Lenders: None
Priority Claims: None
Unsecured Claims: None

MediCor Mgmt
Secured Claim of the Senior Lenders: $78,101.761.02
Priority Claims: $10,950.00
Unsecured Claims: $23,136,520.04

MDC
Secured Claim of the Senior Lenders: $78,101.761.02
Priority Claims: $46,508.66
Unsecured Claims: $6,287,242.95

MediCor Aesthetics
Secured Claim of the Senior Lenders: $78,101.761.02
Priority Claims: None
Unsecured Claims: $636,351.81

PIP.America
Secured Claim of the Senior Lenders: $78,101.761.02
Priority Claims: $2,373.21
Unsecured Claims: $12,525,751.24

IPI
Secured Claim of the Senior Lenders: $78,101.761.02
Priority Claims: None
Unsecured Claims: $172,054.17

**E.      Claims Process and Bar Dates.**

On October 24, 2007, the Bankruptcy Court entered an order establishing certain bar dates (the "Bar Dates Order"), which generally required any Entity, other than a Governmental Unit, holding or asserting a Claim against any of the Debtors that arose on or prior to June 29, 2007 to file a written proof of claim on or before December 3, 2007. Pursuant to the Bar Dates Order, Governmental Units were generally required to file proofs of claim on or before January 7, 2008.

The Bar Dates Order also establishes other bar dates that are applicable in other circumstances as set forth in the Order. The Bar Dates Order further provides that any Entity that is required to file a proof of claim against the Debtors in the Debtors' Chapter 11 Cases, but that fails to properly do so by the applicable bar date, shall not be treated as a creditor with respect to such Claim for purposes of voting and distribution under any plan or plans of reorganization or liquidation in the Debtors' Chapter 11 Cases.

**F.**     **Treatment of Nonresidential Real Property Leases and Executory Contracts.**

1.     The Skyview Lease.

On July 20, 2007, the Debtors filed a motion for an order authorizing the Debtors to reject a certain lease (the "Skyview Lease") between III and Skyview Business Park, by which III leased office space in Las Vegas, Nevada in which the Debtors' maintained their corporate offices until March 3, 2007.  On July 31, 2007, the Bankruptcy Court entered an order approving the Debtors' rejection of the Skyview Lease effective as of the Petition Date.

2.     The Openwave Lease.

Prior to the Petition Date, MDC was party to a certain sub-sublease (the "Openwave Lease") with Openwave Systems Inc. ("Openwave") by which MDC sub-subleased certain nonresidential real property in Santa Barbara, California (the "Santa Barbara Facility"). MediCor is a guarantor of the performance of MDC's obligations under the Openwave Lease. Openwave agreed to waive the post-petition rent due under the Openwave Lease for the month of August 2007 as part of its ongoing negotiations with the Debtors.

Subsequent to the Petition Date, the only operations conducted by the Debtors at the Santa Barbara Facility related to prosecution of the Biosil PMA and maintenance of the PMA-Related Assets.  As a result of the Debtors' wind-down of the Biosil PMA in November 2007, the Debtors no longer had any use for the Santa Barbara Facility.  Accordingly, on November 21, 2007, the Debtors filed a motion for an order pursuant to Section 365 of the Bankruptcy Code (i) authorizing the Debtors to reject the Openwave Lease as of November 30, 2007, and (ii) approving a related stipulation between the Debtors and Openwave (the "Openwave Stipulation").  In accordance with Openwave Stipulation, the Debtors vacated the Santa Barbara Facility on November 29, 2007.  On November 30, 2007, the Bankruptcy Court signed an order authorizing the Debtors' to reject the Openwave Lease effective as of November 30, 2007 and approving the Openwave Stipulation.

3.     The Biosil PMA-Related Contracts.

Prior to the Petition Date, MDC was party to three consulting agreements with third parties relating to the Debtors' prosecution of the Biosil PMA and MediCor and MDC were party to an employment agreement with MDC's chief executive officer (collectively, the "PMA-Related Contracts").   MDC was also party to a commercial alarm installation and service agreement relating to its alarm system at its Santa Barbara Facility (the "Alarm Service Agreement").  As a result of the Debtors' termination of the Biosil-PMA in November 2007, the Debtors no longer had any use for nor did they continue to derive any benefit from the PMA-Related Contracts.  In addition, upon vacating the Santa Barbara Facility, the Debtors' no longer derived any benefit from the Alarm Service Agreement.  Accordingly, on November 30, 2007, the Debtors filed a motion  for an order pursuant to Section 365 of the Bankruptcy Code authorizing the Debtors to reject the PMA-Related Contracts and the Alarm Service Agreement effective as of November 30, 2007 (the "Executory Contract Rejection Motion").  On December 19, 2007, the Bankruptcy Court entered an order granting the relief sought by the Executory Contract Rejection Motion.

**G.      The Sale Motion.**

As noted above, the Debtors and Alvarez & Marsal commenced a comprehensive and thorough pre-petition marketing and sale process on or about February 1, 2007, in order to elicit interest in the sale of the Debtors' assets and businesses.  These efforts continued in earnest after the Petition Date.  However, despite their diligent pre and post-petition efforts, the Debtors were unable to secure a bidder willing to serve as a stalking horse in an auction sale of the Debtors' assets and businesses.  Notwithstanding the absence of a stalking horse bidder, the Debtors strongly believed that bidders remained interested in acquiring certain of the Debtors' assets and that the value of their estates might be maximized by conducting an open auction process in order to generate the highest and best offer for these assets.

On August 7, 2007, the Debtors, in their reasonable business judgment and in consultation with the Committee and the Debtors' Senior Lenders and Post-Petition Lenders (collectively, the "Lenders"),[8] filed a motion (the "Sale Motion") seeking authority for MDC to sell all or substantially all of its assets, including the PMA-Related Assets, and for the Debtors to cause and direct certain of their non-debtor subsidiaries to sell their equity interest, stock, and related equity securities in ES Holdings and in Biosil and Nagor (collectively, the "Non-Debtor Assets") subject to an auction to be conducted pursuant to certain bid procedures (the "Bid Procedures").

On August 24, 2007, the Bankruptcy Court entered an order approving the Bid Procedures proposed in the Sale Motion.  Pursuant to the Bid Procedures, parties seeking to purchase the assets were required to submit formal binding bids without condition as to financing, additional due diligence, or authority for the proposed bidder to participate in the auction on or before September 7, 2007.  In response to the Bid Procedures, the Debtors received several expressions of interest and one bid which contained certain contingencies that precluded it from being a qualified bid.  As a result, the auction sale scheduled for September 18, 2007 was canceled, and the hearing on the Sale Motion scheduled for September 24, 2007 was adjourned to October 23, 2007.  Subsequently, the hearing on the Sale Motion was further adjourned to November 20, 2007.

In consultation with the Committee and the Lenders, the Debtors continued negotiations with the party that submitted the contingent bid in contemplation of a potential sale of the PMA-Related Assets and the Non-Debtor Assets.  The potential bidder ultimately decided not to move forward with the sale and withdrew its bid.  As a result, the Debtors withdrew the Sale Motion on November 13, 2007.

As a result, the Debtors began to refocus their efforts on the possibility that they might have to restructure their businesses and emerge from bankruptcy as a going concern.  The Debtors and their non-debtor European subsidiaries began the process of implementing a new business plan for the European subsidiaries designed to reduce costs, increase gross margins and to improve overall productivity and profits.  The plan included a revamping of the management team of Eurosilicone, Biosil and Nagor to provide management direction and strategic planning necessary to enhance European operations, maximize the value of the European businesses and

---

[8] The Debtors' pre- and post-petition lenders are the same parties.

to put them in a position to continue to operate as going concerns. In addition, the Debtors sought to wind down their prosecution of the Biosil PMA.

While implementing these initiatives, the potential purchaser resurfaced, advised the Debtors that it had addressed its financing issues, and expressed a desire to continue negotiations. Those negotiations resulted in the execution of agreements on or about March 20, 2008, for the sale of the PMA-Related Assets and all of the issued and outstanding shares of Biosil, Nagor, and Eurosilicone to the purchaser, and the refiling by the Debtors of their motion [Docket No. 431] to sell substantially all of their assets (the "Second Sale Motion", and together with the First Sale Motion, the "Sale Motions").

The Receiver filed a limited objection to the proposed sale. In his objection, the Receiver did not object to the proposed sale of assets, but rather objected principally to the proposed distribution of the proceeds of the sale of the stock of Eurosilicone. The Receiver also filed an action in the commercial court in Paris, France (the "French Proceeding") and requested an expedited hearing on his request that the French Court hold the proceeds of the sale of the stock of Eurosilicone in escrow pending a determination as to the respective parties' entitlement to those proceeds. By opinion and order entered on or about April 15, 2008, the French Court denied the relief requested by the Receiver and dismissed the French Proceeding.

By Order dated April 23, 2008 [Docket No. 502], the Bankruptcy Court approved the Second Sale Motion, and thereby authorized the Debtors to sell (the "Sale") substantially all of their assets, and to cause and direct certain of their non-debtor subsidiaries to sell the Non-Debtor Assets, to Global Consolidated Aesthetics (US) Corp. and other related entities (the "Purchasers") for aggregate consideration of $51.5 million, and authorized the disbursement of certain of the proceeds of the Sale over the Receiver's objection while denying certain other proposed disbursements to which the Receiver had objected. The sale of the assets closed on May 30, 2008. The net proceeds from the sale of the Debtors' subsidiary Eurosilicone SAS are currently held in escrow accounts established pursuant to order of the Bankruptcy Court (the "Eurosilicone Escrow Funds"). The net proceeds of the sale of Eurosilicone in the sum of $20,366,100.03 as of January 31, 2010, are being held in escrow by Debtors' counsel. In addition, approximately $300,000.00 of the Eurosilicone sales proceeds is being held in Europe to pay wind-down costs of Eurosilicone's foreign affiliates. Net proceeds from the sale of Biosil and Nagor in the approximate amount of $1,100,000.00 are being held by MediCor. These proceeds shall be applied to pay the Receiver Settlement (assuming the Receiver Settlement Agreement is fully executed and approved by the courts), to cover the costs of completing the liquidation and windup of the Debtors' businesses and for distribution to Holders of Allowed Claims.

The Receiver filed an appeal of the Order approving the Sale (the "Sale Order Appeal"), which purportedly was limited to challenging those portions of the Sale order that authorize application of a portion of the proceeds of the Sale to pay down certain obligations due to the Lenders. The Purchasers were unwilling to close on the sale of Eurosilicone unless the Receiver consented to the sale, agreed that he would not assert any claims against the Purchasers, and provided certain other assurances. The Receiver provided such assurances, and the Purchasers closed on the sale of Eurosilicone.

**H.      The Settlement with the Prior Owners of Biosil and Nagor.**

In connection with the Sale, the Debtors also resolved certain issues with the prior owners of Biosil and Nagor (the "Alsops").  As part of Biosil UK's August 2006 purchase of Biosil and Nagor, the Alsops were granted a charge over 30% of the shares of Biosil and Nagor (the "Charged Shares") to secure payment of £7.0m of deferred purchase price.  After a payment default, the Charged Shares were delivered to the Alsops on October 3, 2007.  As a condition of closing on the Sale discussed above, Biosil UK was required to deliver the Charged Shares to the Purchasers.  Pursuant to a settlement between the Debtors and the Alsops, the Charged Shares were delivered to the Purchasers and $6,000,000 from the proceeds of the sale of Biosil and Nagor was paid to an escrow account for the benefit of the Alsops.

**I.      The Receiver's Adversary Complaints**

On December 17, 2007, the Receiver resigned from the Committee and filed an adversary proceeding against Debtor MediCor, Ltd., Non-Debtor Subsidiaries Europe ApS, ES Holdings, and Laboratories Eurosilicone SAS, the Prepetition Collateral Agent, and the Senior Lenders (Adversary Case No. 07-51806) (the "First Adversary Proceeding").  The Receiver filed an amended complaint on April 2, 2008.  In the complaint, the Receiver contends, among other things, that assets purchased with funds allegedly misdirected from SouthWest Exchange, including the stock of non-debtor European subsidiary Eurosilicone, are held in trust for the benefit of the Receiver's constituency.  The complaint brought claims seeking, *inter alia*, recovery for alleged fraudulent transfers and unjust enrichment, a declaratory judgment that plaintiff's interests in trust assets were not avoidable, that trust assets were not property of debtors' bankruptcy estates, and that the Senior Lenders' liens and security interests either did not attach to trust assets or were subordinate and junior to plaintiff's interests in trust assets.

On April 18, 2008, the Receiver filed a second adversary proceeding against Debtor MediCor, Ltd. and the Senior Lenders (Adversary Case No. 08-50597) (the "Second Adversary Proceeding") seeking a determination of the validity and extent of the Senior Lenders' liens with respect to a certain intercompany loan contract and intercompany receivable.  In the Second Adversary Proceeding, the Receiver also sought to hold MediCor and ES Holdings guilty of a civil conspiracy aimed at the interests represented by the Receiver and damages against MediCor in an amount not less than $37,000,000.

**J.      The Debtors' Settlement Discussions and Mediation.**

Since the Petition Date, the Debtors have facilitated and engaged in discussions among the Senior Lenders, the Committee, the Receiver, and other interested parties concerning resolution of the Debtors' Chapter 11 Cases.  In late March 2008, the Debtors, the Senior Lenders, the Receiver and the Committee participated in a mediation before former Bankruptcy Judge Ralph Mabey in Philadelphia, Pennsylvania concerning resolution of the Receiver's claims and the terms of a consensual plan of reorganization.  The Receiver's First Adversary Complaint was held in abeyance during the pendency of the mediation.  While progress was made in the mediation, the parties left Philadelphia without reaching agreement.  Over the next several months, settlement discussions continued, and Judge Mabey played a significant role in those discussions.

**K.     The Settlement with the Receiver.**

**THE DESCRIPTION OF THE RECEIVER SETTLEMENT AGREEMENT SET FORTH BELOW IS ONLY A SUMMARY AND IS QUALIFIED, IN ITS ENTIRETY, BY THE RECEIVER SETTLEMENT AGREEMENT AND ITS RELATED PLEADINGS. THIS SUMMARY IS PROVIDED FOR INFORMATIONAL PURPOSES ONLY.**

Subsequently, the Debtors, the Senior Lenders, the Receiver, the Southwest Exchange Receivership Entities, Members of the Settlement Class, the Class Representative Plaintiffs,[9] the Opt-Out Individual Plaintiffs and non-debtors MediCor Europe Holdings ApS, ES Holdings SAS and Biosil U.K. Limited (collectively, the "Receiver Settlement Parties") reached a settlement (the "Receiver Settlement") pursuant to which, *inter alia*, all of the Receiver's claims, as well as related claims of the Southwest Exchange entities and their customers, will be resolved, the First and Second Adversary Proceedings and the Sale Order Appeal filed by the Receiver will be dismissed and the Receivership Action and the Consolidated Class Actions (as defined below) will be dismissed.  Pursuant to the Receiver Settlement, the Debtors will pay the sum of three-million-nine-hundred-and-fifty-thousand dollars ($3,950,000.00, or the "Receiver Settlement Amount") to a Settlement Trustee to be appointed by the United States District Court for the District of Nevada (the "Receiver Settlement Trustee").  On November 30, 2009, the Receiver Settlement Parties executed an agreement documenting the Receiver Settlement (the "Receiver Settlement Agreement").

Pursuant to the Receiver Settlement Agreement, the Settlement Trustee will have sole responsibility for distributing the Receiver Settlement Amount to a settlement class comprised of all persons and entities (collectively, the "Members of the Settlement Class") that:

(i) were customers of Southwest Exchange, Inc. or Southwest Exchange Corporation, and all of their past, present and future parents, subsidiaries, affiliates, successors, assigns, predecessors, member firms, related entities, divisions, and business units ("SWX");

(ii) were customers of Qualified Exchange Services, Inc., and all of its past, present and future parents, subsidiaries, affiliates, successors, assigns, predecessors, member firms, related entities, divisions, and business unit ("QES"),

(iii) directly or indirectly transferred any assets to or deposited any assets with SWX or QES, or

(iv) directly or indirectly suffered any loss arising out of, in connection with, or in any way related to the failure of SWX or QES to make payments or transfers of assets to their customers, including, but not limited to, the persons and entities set forth on Schedule A to the Receiver Settlement Agreement.

---

[9]   Each of the capitalized terms used in this section that are not otherwise defined in the Plan or this Disclosure Statement shall have the meaning prescribed to it in the Receiver Settlement Agreement.

Additionally, the Receiver Settlement Agreement provides for certain mutual releases and covenants not to sue by and among, the parties to the Agreement. The Senior Lenders are not releasing Southwest Exchange, QES, the Other Receivership Entities, the Receiver, the Debtors or the Non-Debtors, among others. Specifically excluded from the releases are Donald K. McGhan, Nikki Pomeroy, James McGhan, Shirley McGhan, Theodore Maloney, Marc Sperberg, Peter J. DeMarigny, Stewart Greenberg, Greenberg & Company, LLC, all current and former directors and officers of the Debtors and the Non-Debtors (except any principals or associates of Alvarez & Marsal, LLC), Patrick Byrne, Snell & Wilmer, and all insurers of the foregoing.

The Receiver Settlement Agreement further provides that upon payment of the Settlement Amount to the Settlement Trustee, all proofs of claim or any other claims or interests filed or asserted in the Chapter 11 Cases by the Receiver, SWX, QES, the Other Receivership Entities, Members of the Settlement Class and the Opt-Out Individual Plaintiffs, including, without limitation, certain proofs of claim identified on <u>Schedule H</u> annexed to the Receiver Settlement Agreement, shall be deemed withdrawn and expunged, and the claimants with respect to asserted claims or interests shall not be entitled to receive any payments or distributions on account of such claims or interests in the Chapter 11 Cases (other than their portion, if any, of the Settlement Amount provided for therein).

The Plan and Disclosure Statement are predicated on the assumption that prior to the deadline for objecting to and voting on the Plan, the Southwest Exchange Settlement Orders will have been obtained, and the Receiver Settlement Amount will have been paid to the Receiver Settlement Trustee. Following payment of the Receiver Settlement Amount to the Receiver Settlement Trustee, the Receiver, SWX, QES, the Other Receivership Entities, the Class Representative Plaintiffs, the Members of the Settlement Class, and the Opt-Out Individual Plaintiffs shall (i) be deemed to vote in favor of any plan of liquidation in the Chapter 11 Cases which provides that such persons and entities shall not receive any distributions or recoveries pursuant to any such plan (other than their portion, if any, of the Settlement Amount provided for herein), and (ii) not make an appearance with respect to any matter in the Chapter 11 Cases, including, but not limited to, filing any objections with respect to, or seeking to recover any distributions or recoveries pursuant to, any such plan; <u>provided</u>, <u>however</u>, that nothing therein shall prevent any party from making an appearance in the Chapter 11 Cases for the purpose of obtaining an order enforcing, construing or awarding damages or other relief for any breach of the Receiver Settlement Agreement or failure to comply with the court orders approving the Receiver Settlement Agreement.

In accordance with the Receiver Settlement Agreement, the Receiver will file motions seeking the entry of orders providing for, among other things, the following:

1.    In Action No. 2:07-cv-00816-RCJ-LRL in the United States District Court for the District of Nevada entitled <u>Howard J. Hawkes Trust UTA Dated November 1, 1991 v. Qualified Exchange Services, Inc., et al.</u> and Action No. CV07-02088 SJO VBK(x) in the United States District Court for the Central District of California entitled <u>Sorrell v. Qualified Exchange Services, Inc.</u>, both of which have been coordinated or consolidated for pretrial purposes under Action No. 2:07-cv-01394-RCJ-LRL in the United

States District Court for the District of Nevada entitled <u>MDL No. 1878 -- In Re: Internal Revenue Service §1031 Tax Deferred Exchange Litigation</u> (the "Consolidated Class Actions"), a final, non-appealable order(s) (the "Class Action Settlement Order"), *inter alia*, certifying the Settlement Class, approving the Receiver Settlement Agreement and barring all claims and suits by any Member of the Settlement Class, setting a deadline for opt-out of the Settlement Class (the "Opt-Out Deadline"), and appointing the Settlement Trustee who will be empowered to receive, distribute and otherwise administer the Receiver Settlement Amount.

2.       In Action 07-A-535439-B in the Eighth Judicial District Court of the State of Nevada in and for the County of Clark entitled <u>In Re Receivership of Southwest Exchange, Inc. and Consolidated Litigation</u>" (the "Receivership Action"), a final, non-appealable order approving the Receiver Settlement Agreement and finding that the Receiver Settlement Agreement was entered into by the parties in good faith (the "Receivership Settlement Order").

The Receiver Settlement Agreement further provides that within five (5) business days after (1) the Receivership Settlement Order has been entered in the Receivership Action and becomes a final non-appealable order, (2) the class opt-out period established by the Court in the Consolidated Class Actions has expired, (3) the rights of the Debtors and the Senior Lenders to terminate the Receiver Settlement Agreement have expired, and (4) the Class Action Settlement Order has been entered in the Consolidated Class Actions and becomes a final non-appealable order, the Debtors will file a motion in the Bankruptcy Court seeking entry of a final and non-appealable order (the "Bankruptcy Court Settlement Order") approving the Receiver Settlement Agreement pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure.

The entry of the Bankruptcy Court Settlement Order, the Class Action Order, and the Receivership Approval Order as final orders are conditions precedent to the confirmation of the Plan.

## L.       The Director and Officer Settlement

Additionally, the plaintiffs in the Consolidated Class Actions sued Donald K. McGhan, his son, and certain other officers and directors of Medicor who were insureds under a directors & officers ("D&O") insurance policy Carolina Casualty Company ("Carolina") issued to Medicor.  RSUI Indemnity Company ("RSUI") was an excess carrier on the policy.  Carolina filed separate coverage litigation styled <u>Carolina Casualty Company v. Donald K. McGhan, et al.</u>, Case No. 07-CV-0949 PMP-GWF in the United States District Court for the District of Nevada seeking a determination that the Medicor D&O policy did not cover the plaintiffs' claims in the Consolidated Class Actions.  Carolina twice unsuccessfully moved for summary judgment. Thereafter, in late 2008, Carolina agreed to engage in settlement discussions with the plaintiffs in the Consolidated Class Actions, the Receiver, certain state court Opt-Out Plaintiffs and other Medicor creditors.  The initial meeting in Chicago was productive and negotiations continued over the next several months.  The excess carrier RSUI became involved and a settlement was

reached in mid 2009 (the "Director/Officer Settlement"). The Committee participated in the negotiations as the representative of the Debtors' estates.

Under the terms of the Director/Officer Settlement, Carolina and RSUI agree to pay a total of $4,542,943.57, which includes: $275,000 to the Committee for the unsecured creditors of Medicor; $2,204,443.57 to the qualified settlement fund for the benefit of the Settlement Class, the Receiver and the Opt-Outs; $2,063,500 to a litigation defense trust to pay defense costs, if any, incurred by Carolina/RSUI insureds in certain related litigation with any funds remaining at the conclusion of that case escheating to the benefit of the Settlement Class, the Receiver and the Opt-Outs.

The parties to the Director/Officer Settlement are: (i) the Class Plaintiffs, the other Class Members, the state court Opt-Out Plaintiffs, the Receivership Entities, and the Medicor Unsecured Creditors (collectively the "Releasors"); (ii) Jim McGhan, Don McGhan, Thomas Moyes, Paul Kimmel, Samuel Clay Rogers, Mark Sperberg, Ted Maloney, Tom Hartley, Mark Brown, Eugene Davis, Robert Forbuss, and Ikram Khan (collectively, the "Individual Insureds"); Nikki Pomeroy and Shirley McGhan (the "Additional Settling Parties"); and (iii) Carolina Casualty Company ("Carolina") and RSUI Indemnity Company ("RSUI").

The carriers shall also pay $300,000 to certain defense lawyers for Medicor directors and officers to cover defense costs: $200,000 is to be paid to Gordon Silver, Ltd., counsel to the McGhans and $100,000 to Martin & Allison, Ltd., counsel to certain directors of Medicor. $795,556.43 was already paid for legal expenses incurred by certain Medicor directors and officers.

In exchange for the Carolina and RSUI payments: (i) the plaintiffs and other releasors will dismiss with prejudice and release all claims against Medicor, the Medicor officers and directors (excepting Donald McGhan) and Carolina and RSUI; (ii) the Medicor officers and directors and the other releasees will release all claims against Carolina and RSUI; and (iii) the plaintiffs will file Satisfactions of Judgment as to the $98,000,000 Judgment previously obtained against Ted Maloney and the $20,000,000 Judgment previously obtained against Tom Hartley.

The Director/Officer Settlement is conditioned upon the occurrence of each of the following: (i) Preliminary and Final Approval in this action, including Class certification for settlement purposes only; (ii) no opt-outs, except for those State Court Plaintiffs who agree to be bound by the settlement; (iii) the entry of an Order by Judge Gonzalez in the related State Court action determining the settlement to be a good faith settlement; (iv) payment by Carolina and RSUI of the Exchanger's portion of the settlement funds (both Class and Opt-Out); and (v) payment by Carolina and RSUI of the Medicor Unsecured Creditors' share of the settlement funds to their designated agents.

## M.    Motion to Approve Settlements

On February 1, 2010, the plaintiffs in the Consolidated Class Actions, on behalf of themselves and a settlement class, filed a motion pursuant to Fed. R. Civ. P. 23(e) seeking, *inter alia*: (i) preliminary approval of the Receiver Settlement Agreement and the D&O Settlement Agreement; (ii) an order directing notice to the settlement class; (iii) a scheduling order setting a

final fairness hearing; and (iv) for final approval of the proposed Receiver Settlement Agreement and the D&O Settlement Agreement following the final fairness hearing (the "Preliminary Approval Motion"). A hearing on the Preliminary Approval Motion has been scheduled for March 29, 2010 at 9:00 a.m., Pacific Time, in the Courtroom of the Honorable Robert C. Jones, United States District Court for the District of Nevada, United States Courthouse, 333 Las Vegas Blvd. South, Las Vegas, Nevada 89101. The time and date of the hearing for final approval of the settlement agreements is expected to be set at the preliminary approval hearing.

On February 2, 2010, the Receiver filed a motion in the Receivership Action seeking: (i) approval of the Receiver Settlement Agreement; (ii) a determination that the Receiver Settlement Agreement was in good faith pursuant to Nevada Revised Statute 17.245; (iii) a bar order from the institution of actions for contribution or indemnity against any Secured Lender; and (iv) certification pursuant to Rule 54(b) of the Nevada Rules of Civil Procedure.

**N.      The Settlement with the Committee.**

Additionally, as a result of good faith, arms-length negotiations between the Prepetition Collateral Agent, on behalf of the Senior Lenders, the Debtors, and the Committee, on behalf of the Holders of General Unsecured Claims (other than the Holders of Southwest Exchange Claims),[10] the Debtors, the Committee and the Senior Lenders reached an agreement to be implemented pursuant to the Plan (the "General Unsecured Creditor Settlement").

The Plan will be funded from the cash collateral of the Senior Lenders. The Senior Lenders have agreed to carve out and forgo a portion of their recovery on account of their Allowed Senior Lender Secured Claims to provide cash distributions to Holders of General Unsecured Claims (other than the Holders of Southwest Exchange Claims which are covered by the Receiver Settlement Agreement) on the terms set forth in the Plan. Pursuant to the General Unsecured Creditor Settlement, the Senior Lenders have agreed to permit their cash collateral to be used to fund a payment of $700,000.00 (the "General Unsecured Cash Payment") to a liquidating trust to be established under the Plan (the "Liquidating Trust"). As discussed herein, the General Unsecured Cash Payment will be used exclusively to fund distribution(s) to Holders of Allowed General Unsecured Claims, as defined in the Plan.

The General Unsecured Creditor Settlement also calls for the prosecution of certain litigation claims (the "Litigation Claims") by the Liquidating Trust and for the Litigation Claims to be assigned over to or vested in the Liquidating Trust free and clear of claims, liens, charges, trusts, and interests except those of the Senior Lenders and the Holders of Allowed General Unsecured Claims. The Senior Lenders have also agreed to permit their cash collateral to be used to fund a cash payment of $ 100,000.00 (the "Litigation Fund Payment") by the Debtors to the Liquidating Trust for the funding of fees and expenses incurred by the Liquidating Trust. The Liquidating Trust Expense Reserve will be established by the Liquidating Trustee to hold funds as are reasonably necessary for the Trust to satisfy the expenses of administering the

---

[10] As set forth in the Plan, the General Unsecured Claims do not include any of the Southwest Exchange Claims. All Southwest Exchange Claims will be resolved pursuant the Receiver Settlement Agreement and Holders of Southwest Exchange Claims shall not participate in the General Unsecured Creditor Settlement in any manner.

Liquidating Trust, including, without limitation, the Liquidating Trustee's reasonable professional fees and expenses.

The parties have agreed that any net recoveries from the Litigation Claims shall be used to repay the Senior Lenders for the Litigation Fund Payment first, and thereafter shall be paid fifty percent (50%) to the Prepetition Collateral Agent on behalf of the Senior Lenders on account of the Senior Lenders' Deficiency Claims, and fifty percent (50%) to the Holders of Allowed General Unsecured Claims pro rata on account of their allowed pre-petition unsecured claims.

In consideration for the General Unsecured Cash Payment, a $10 million reduction of the principal balance of the Allowed Senior Lender Secured Claims, the Litigation Fund Payment, and the Distribution of the General Unsecured Creditor Litigation Proceeds to Holders of General Unsecured Claims, the Committee agrees that the Debtors and their estates may waive any challenges or defenses to the Senior Lenders' liens and debt claims, including, without limitation, all available challenges under Chapter 5 of the Bankruptcy Code. The Plan shall constitute the motion of the Debtors, the Committee and the Senior Lenders to approve such General Unsecured Creditor Settlement pursuant to Bankruptcy Rule 9019.

**O.      Claims Against Greenberg & Company, LLC**

Additionally, the Debtors affirmatively consented to granting the Committee derivative standing to commence, prosecute, compromise, and release, on behalf of the Debtors and the Debtors' estates, claims against Greenberg & Company CPAs, LLC ("Greenberg & Company"). The Bankruptcy Court approved the agreement and granted the Committee such standing by order dated May 6, 2009. [Docket No. 838]. The Committee has entered into an agreement with Greenberg & Company tolling those claims. It is anticipated that the Liquidating Trustee will pursue the claims against Greenberg & Company and any other Litigation Claims transferred pursuant to the Plan.

# V.  GENERAL INFORMATION ON VOTING
# AND CONFIRMATION PROCEDURE

**A.      Purpose of Disclosure Statement.**

The Disclosure Statement is generally provided to all Holders of Claims entitled to vote upon the Plan pursuant to Section 1125 of the Bankruptcy Code to enable such Holders to make an informed decision concerning the Debtors' solicitation of acceptances of the Plan. After notice and a hearing conducted on _____, by Final Order dated _____, the Bankruptcy Court approved this Disclosure Statement as containing "adequate information" (as defined in Section 1125(a) of the Bankruptcy Code) of a kind, and in sufficient detail, to enable a hypothetical reasonable investor typical of the Holders of Claims against the Debtors to make an informed decision in voting to accept or reject the Plan. Approval of this Disclosure Statement by the Bankruptcy Court, however, does not constitute a recommendation to accept or reject the Plan.

**B.** **Voting On The Plan.**

1. <u>Who May Vote.</u> Pursuant to Section 1126 of the Bankruptcy Code, only the Holders of Claims or Equity Interests in classes that are Impaired by, and are receiving Distributions under, the Plan may vote on the Plan. Holders of Claims or Equity Interests Unimpaired by the Plan are deemed to accept the Plan and do not have the right to vote on the Plan. Holders of Claims or Equity Interests who receive no recovery under the Plan are deemed to reject the Plan and are not entitled to vote on the Plan. Administrative Expense Claims and Priority Tax Claims are not generally classified for purposes of voting or receiving Distributions under the Plan. In this case, Holders of Class 3, Class 4 and Class 5 Claims are entitled to vote to accept or reject the Plan. If you are entitled to vote to accept or reject the Plan, a Ballot has been enclosed for the purpose of voting.

2. <u>Eligibility.</u> In order to vote on the Plan, a Creditor must have timely filed or been assigned a timely filed proof of claim, unless its Claim is listed on the Debtors' 521 Disclosure Schedules and is not identified as disputed, unliquidated or contingent or has not been objected to prior to the Confirmation Hearing. Creditors having an Allowed Claim in more than one Class may vote in each Class in which they hold a separate Claim by casting a Ballot in each class.

3. <u>Binding Effect.</u> Whether a Creditor votes on the Plan or not, such person shall be bound by the terms of the Plan if the Plan is confirmed by the Bankruptcy Court. Unless a Ballot is completed and returned in accordance with approved Bankruptcy Court procedures, a Creditor shall not be included in the vote for purposes of accepting or rejecting the Plan or for purposes of determining the number of Creditors voting on the Plan.

4. <u>Procedure/Voting Deadlines.</u> In order for your vote to count, you must complete, date, sign and properly mail or deliver the enclosed Ballot (please note that envelopes have been included with the Ballot) to the Balloting Agent, Epiq Bankruptcy Solutions, LLC, at the appropriate address set forth below:

If submitted by <u>ordinary mail</u>, the Ballot must be addressed to:

MediCor, Ltd Ballot Processing
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, P.O. Box 5014
New York, NY 10150-5014

If submitted by <u>hand delivery or overnight delivery</u>, the Ballot must be addressed to:

MediCor, Ltd Ballot Processing
c/o Epiq Bankruptcy Solutions, LLC
757 Third Avenue, 3rd Floor
New York, NY 10017

Pursuant to Bankruptcy Rule 3017, the Bankruptcy Court has ordered that **original** Ballots for the acceptance or rejection of the Plan must be received by ordinary mail, courier

service or hand delivery to the Balloting Agent, at the appropriate address set forth above on or before _____**p.m., (Prevailing Eastern Time) on** _____ **(the "Voting Deadline"). Facsimile or electronically submitted Ballots will not be counted.** Once you have delivered your Ballot, you may not change your vote, except upon cause shown to the Bankruptcy Court after notice and a hearing.

Any Ballot received that is incomplete in any way shall be deemed to be cast as follows:

(a)        Ballots received that do not evidence the amount or evidence an incorrect amount of such Creditor's Claim shall be completed or corrected, as the case may be, based upon the following hierarchy: (i) the claim amount temporarily allowed by Court order for voting purposes pursuant to Bankruptcy Rule 3018; (ii) the amounts of any timely filed proofs of Claim which have not been objected to prior to the Voting Deadline; and (iii) the claim amount listed on the 521 Disclosure Schedules filed by the Debtor if no proof of Claim has been filed by such Creditor, and counted as a vote to accept or reject the Plan;

(b)        Ballots received that do not identify the Creditor, whether or not signed by the Creditor, shall not be counted as a vote to accept or reject the Plan;

(c)        Ballots received that do not reflect in which Class such Ballot is cast or incorrectly classify such Creditor's Claim and that are otherwise properly completed shall be completed or corrected, as the case may be, and counted as a vote to accept or reject the Plan in the Class designated by the Debtor; and

(d)        Ballots received that are completed, except that such Creditor failed to vote to accept or reject the Plan, shall be completed and counted as a vote to accept the Plan.

You are urged to timely complete, date, sign and promptly return the enclosed Ballot by mail, courier service or hand delivery**. BALLOTS TRANSMITTED IN ANY OTHER FORM (E.G., BY FACSIMILE OR ELECTRONICALLY (E-MAIL)) WILL NOT BE ACCEPTED.** Please be sure to complete the Ballot properly and legibly identifying the exact amount of your Claim, the Class(es) in which the Claim(s) is/are classified under the Plan and the name of the Creditor.

Each Holder of a Claim that is entitled to vote on the Plan may elect by checking the appropriate box provided on the Ballot not to grant the releases set forth in Section 10.2(c) of the Plan.

**C.        Plan Confirmation Process.**

1.        <u>Requirements.</u>        The requirements for confirmation of the Plan are set forth in detail in Section 1129 of the Bankruptcy Code.  The following summarizes some of the pertinent requirements:

(a)        <u>Acceptance by Impaired Classes.</u>  Except as noted below, each Impaired Class of Claims and each Class of Equity Interests must either vote to accept the Plan or be deemed to accept the Plan.  "Impaired" is defined in Section 1124 of the Bankruptcy Code.  A Claim or Equity Interest is Impaired unless the Plan leaves unaltered the legal, equitable, or

contractual rights of the Holder. Under the Plan, Class 3, Class 4, Class 5, Class 6, Class 7 and Class 8 are impaired. Holders of Claims in Class 3, Class 4 and Class 5 are entitled to vote, separately, to accept or reject the Plan. Holders of Claims in Class 1 have or shall receive full Distributions under the Plan and, therefore, are deemed under Section 1126(f) of the Bankruptcy Code to have accepted it. Class 2 Claims have been or will be deemed withdrawn or expunged in accordance with the Bankruptcy Settlement Order and, therefore, Holders of Claims in Class 2 are or will be deemed under the Receiver Settlement Agreement to have accepted the Plan. Holders of Claims in Class 6 and Class 7 and Holders of Equity Interests and Claims in Class 8 receive no Distributions under the Plan and, therefore, are deemed under Section 1126(g) of the Bankruptcy Code to have rejected it. As a voting Creditor, your acceptance of the Plan is important. In order for the Plan to be accepted by an Impaired class of Claims, a majority in number holding two-thirds in dollar amount of the Claims voting (of each Impaired class of Claims) must vote to accept the Plan. At least one Impaired class of Creditors, excluding the votes of Insiders, must actually vote to accept the Plan.

(b)  <u>Feasibility.</u>  The Bankruptcy Court is required to find that confirmation of the Plan is not likely to be followed by the liquidation or the need for further reorganization of the Debtors and that the parties required to perform or pay monies under the Plan will be able to do so.

(c)  <u>"Best Interests" Test</u>.  The Bankruptcy Court must find that the Plan is in the "best interests" of Creditors. To satisfy this requirement, the Bankruptcy Court must determine that each holder of a Claim against, or Equity Interest in, the Debtors: (i) has accepted the Plan; or (ii) will receive or retain under the Plan money or other property which, as of the Effective Date, has a value not less than the amount such holder would receive if the Debtors' property were liquidated under chapter 7 of the Bankruptcy Code on that date.

(d)  <u>"Cramdown" Provisions.</u>  Pursuant to Section 1129(b) of the Bankruptcy Code, the Bankruptcy Court may confirm the Plan even though a class of Claims or Equity Interests has not voted to accept the Plan, so long as one Impaired class of Claims has accepted the Plan (excluding the votes of Insiders) and the Plan is "fair and equitable" and "does not discriminate unfairly" against the non-accepting classes. Under Section 1129(b) of the Bankruptcy Code, a plan is "fair and equitable" to a class if, among other things, the plan provides: (a) with respect to secured claims, that each holder of a claim included in the rejecting class shall receive or retain, on account of its claim, property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim; and (b) with respect to unsecured claims and equity interests, that the holder of any claim or equity interest, that is junior to the claims or equity interests of such class, will not receive or retain, on account of such junior claim or equity interest, any property unless the senior class is paid in full. A plan does not discriminate unfairly if the legal rights of a dissenting class are treated in a manner consistent with the treatment of other classes whose legal rights are similar to those of the dissenting class and if no class receives more than it is entitled to receive on account of its claim or interest. The Debtors will invoke the "cramdown" provisions of Section 1129(b) of the Bankruptcy Code should any voting Class fail to accept the Plan.

2.  <u>Confirmation Hearing.</u>  To confirm the Plan, the Bankruptcy Court must hold a hearing to determine whether the Plan meets the requirements of Section 1129 of the Bankruptcy

Code (the "Confirmation Hearing"). The Bankruptcy Court has set _____ **(Prevailing Eastern Time)** for the Confirmation Hearing. The Confirmation Hearing will be conducted in the courtroom of the Honorable Mary F. Walrath, United States Bankruptcy Court for the District of Delaware, 824 Market Street, 5th Floor, Courtroom 4, Wilmington, Delaware.

   3. <u>Objections to Confirmation.</u> Any party in interest may object to confirmation of the Plan and appear at the Confirmation Hearing to pursue such objection. The Bankruptcy Court has set _____ as the deadline for filing and serving objections upon the Debtors' attorneys. Objections to confirmation must be filed with the Bankruptcy Court at the following address:

United States Bankruptcy Court
District of Delaware
824 Market Street
Wilmington, Delaware 19801

with a copy simultaneously served upon the attorneys for the Debtors at the addresses below:

Lowenstein Sandler PC
Jeffrey D. Prol, Esq.
Jeffrey A. Kramer, Esq.
65 Livingston Avenue
Roseland, New Jersey 07068

- and -

Greenberg Traurig, LLP
Victoria W. Counihan, Esq.
Dennis Meloro, Esq.
The Nemours Building
1007 North Orange Street, Suite 1200
Wilmington, Delaware 19801

and a copy simultaneously served upon:

   1. Counsel to the Prepetition Collateral Agent:

Paul, Weiss, Rifkind, Wharton & Garrison, LLP
Kelley A. Cornish, Esq.
Marc Falcone, Esq.
1285 Avenue of the Americas
New York, New York  10019

   2. Counsel to the Committee:

Blank Rome LLP
Michael Z. Brownstein, Esq.

The Chrysler Building,
405 Lexington Avenue
New York, NY 10174

Blank Rome LLP
Michael B. Schaedle, Esq.
One Logan Square
130 North 18th Street
Philadelphia, PA 19103-6998

- and -

Blank Rome LLP
David W. Carickhoff, Esq.
1201 Market Street, Suite 800
Wilmington, DE 19801

3.      The Office of the United States Trustee:

Office of the United States Trustee
Jane M. Leamy, Esq.
844 King Street, Suite 2207, Lockbox 35
Wilmington, DE 19801

4.      <u>Binding Effect of Confirmation.</u>  Upon the entry of the Confirmation Order, the Plan shall be binding upon the Debtors, all Holders of Claims, all Holders of Equity Interests and other parties in interest, regardless of whether they cast a Ballot to accept or reject the Plan.  The rights, benefits and obligations conferred on any Person by the Plan shall be binding upon, and inure to the benefit of, the executors, successors, heirs and assigns of such Person and any Persons claiming an interest in any and all property in which the Debtors have an interest within the meaning of Section 541 of the Bankruptcy Code through such Person.

5.      <u>Discharge.</u>  Pursuant to Section 1141(d)(3) of the Bankruptcy Code, Confirmation will not discharge Claims against the Debtors.

6.      <u>Vesting of Assets.</u>  Except as provided in the Plan, upon the Effective Date, the Debtors shall transfer to the Litigation Trust (i) all of their rights, title, and interests in the Litigation Claims and the proceeds thereof, (ii) the General Unsecured Cash Payment, (iii) the Litigation Fund Payment, and (iv) all of their rights, title, and interests in the PIP PMA and the proceeds thereof (collectively, the "Liquidating Trust Assets") and title to the Liquidating Trust Assets shall vest in the Liquidating Trust free and clear of all liens, Claims and Interests, except as expressly provided in the Plan.  The Liquidating Trustee shall liquidate and distribute the Liquidating Trust Assets in accordance with the terms of the Liquidating Trust Agreement and the Plan.  The Debtors shall execute any and all documents necessary to transfer and convey all of the Liquidating Trust Assets to the Liquidating Trust on the Effective Date.

7.     Modification of Plan.  Upon the mutual written consent of the Debtors, the Committee and the Prepetition Collateral Agent, the Debtors may alter, amend, or modify the Plan or any Plan Documents at any time before confirmation.  The Debtors may also seek to modify the Plan at any time after confirmation so long as (i) the Effective Date has not occurred and (ii) the Bankruptcy Court authorizes the proposed modification after notice and a hearing. The Debtors further reserve the right to modify the treatment of any Allowed Claims at any time after the Effective Date of the Plan upon the consent of the Creditor whose Allowed Claim treatment is being modified, so long as no other Creditors are materially and adversely affected.

# VI.  THE PLAN OF LIQUIDATION

This Section summarizes the salient provisions of the Plan.  The Plan is annexed to this Disclosure Statement as Exhibit A.  Parties are encouraged to review the Plan in its entirety for a full understanding of its provisions and impact on creditors.

## A.     Plan Objectives.

The primary objectives of the Plan are to: (i) maximize the value of the ultimate recovery to all Creditors on a fair and equitable basis, compared to the value they would receive if the assets of the Debtors were liquidated under chapter 7 of the Bankruptcy Code; and (ii) settle, compromise or otherwise dispose of certain Claims and Equity Interests on terms believed to be fair and reasonable in the best interests of the Debtors and Creditors.  It is believed that through the Plan, Holders of Allowed Claims will obtain a greater recovery than any recovery they would receive if the Assets of the Debtors were liquidated under Chapter 7 of the Bankruptcy Code.

## B.     Overview of the Plan.

The Plan provides for the treatment of Claims against the Debtors and Equity Interests in the Debtors.  As described in greater detail in Section II of this Disclosure Statement, the Debtors sold substantially all of their assets pursuant to the Sale Order.  Thus, the Plan provides for the wind up of affairs and the distribution of the net proceeds realized therefrom to creditors in accordance with the priorities established by the Bankruptcy Code and pursuant to the General Unsecured Creditor Settlement.  The Plan establishes, among other things, a liquidating trust that will, *inter alia*, prosecute certain litigation, the provisions governing such distributions to Holders of Allowed Claims and the process for resolving Disputed Claims filed against the Debtors.

The Debtors believe that the Plan provides the best and most prompt possible recovery to Holders of Claims.  Under the Plan, Claims against and Equity Interests in the Debtors are divided into different classes.  Under the Bankruptcy Code, "claims" and "equity interests" are classified rather than "creditors" and "shareholders" because such entities may hold claims or equity interests in more than one class.  For purposes of this Disclosure Statement, the term "Holder" refers to the holder of a Claim or Equity Interest, respectively, in a particular Class under the Plan.  If the Plan is confirmed by the Bankruptcy Court and consummated, then on the Effective Date or within the time periods set forth in the Plan, the Debtors and/or the Liquidating Trustee to be appointed at or prior to the Confirmation Hearing, shall make Distributions in

respect of certain Classes of Claims as provided for in the Plan. The Classes of Claims against and Equity Interests in the Debtors created under the Plan, the treatment of those Classes under the Plan and Distributions to be made under the Plan are described below.

**C.     Treatment of Unclassified Claims.**

Unclassified Claims are Unimpaired by the Plan. Each Holder of an Unclassified Claim is conclusively presumed to have accepted the Plan and, therefore, is not entitled to vote to accept or reject the Plan. The following are the unclassified Claims: Priority Tax Claims and Administrative Expense Claims.

1.     <u>Priority Tax Claims.</u>

Priority Tax Claims are unsecured Claims of Governmental Units for taxes owed by the Debtors that are entitled to priority in payment pursuant to Section 507(a)(8) of the Bankruptcy Code.

The taxes entitled to priority are (a) taxes on income or gross receipts that meet the requirements of Section 507(a)(8)(A), (b) property taxes meeting the requirements of Section 507(a)(8)(B), (c) taxes that were required to be collected or withheld by the Debtors and for which the Debtors are liable in any capacity as described in Section 507(a)(8)(C), (d) employment taxes on wages, salaries, or commissions that are entitled to priority pursuant to Section 507(a)(4), to the extent such taxes also meet the requirements of Section 507(a)(8)(D), (e) excise taxes of the kind specified in Section 507(a)(8)(E), (f) customs duties arising out of the importation of merchandise that meet the requirements of Section 507(a)(8)(F), and (g) prepetition penalties relating to any of the foregoing taxes to the extent such penalties are in compensation for actual pecuniary loss as provided in Section 507(a)(8)(G).

The Bankruptcy Code does not require that priority tax claims be classified under a plan. It does, however, require that such claims receive the treatment described below in order for a plan to be confirmed unless the holder of such claims consents to different treatment.

The legal and equitable rights of the Holders of Priority Tax Claims are Unimpaired by the Plan. Pursuant to the Plan, within the time period provided in Section 6.5(a)(1) of the Plan, shall receive from the Debtors, at the election of the Debtors, in consultation with the Prepetition Collateral Agent: (a) Cash equal to the amount of such Allowed Priority Tax Claim; or (b) such other treatment as to which the Debtors, in consultation with the Prepetition Collateral Agent, and the Holder of such Allowed Priority Tax Claim shall have agreed upon in writing.

2.     <u>Administrative Expense Claims.</u>

Administrative Expense Claims are any claims for the payment of administrative expenses, defined in the Plan as any Claim for costs and expenses of administration of the Chapter 11 Cases allowed under Sections 503(b), 507(b) or, if applicable, 1114(e)(2) of the Bankruptcy Code, including but not limited to: (a) any actual and necessary costs and expenses incurred after the Petition Date of preserving the Debtors' Estates and operating the business of the Debtors (such as wages, salaries, commissions for services and payments for inventories, leased equipment and premises) and Claims of Governmental Units for taxes (including Claims

related to taxes which accrued after the Petition Date, but excluding Claims related to taxes which accrued on or before the Petition Date); (b) compensation for legal, financial, advisory, accounting and other services and reimbursement of expenses allowed by the Bankruptcy Court under Sections 328, 330, 331, 363 or 503(b) of the Bankruptcy Code to the extent incurred prior to the Effective Date; and (c) all fees and charges assessed against the Debtor's Estate under Section 1930, chapter 123 of title 28 of the United States Code.

The Bankruptcy Code does not require that administrative expense claims be classified under a plan. It does, however, require that allowed administrative expense claims be paid in full in cash in order for a plan to be confirmed, unless the holder of such claim consents to different treatment.

Pursuant to the Plan and subject to the provisions of Sections 328, 330, 331 and 503(b) of the Bankruptcy Code and within the time period provided in Section 6.5(a)(1) of the Plan, each Holder of an Allowed Administrative Expense shall receive from the Debtors: (a) Cash equal to the amount of such Allowed Administrative Expense Claim, or (b) such other treatment as to which the Debtors, in consultation with the Prepetition Collateral Agent, and the Holder of such Allowed Administrative Expense Claim shall have agreed upon in writing.

Holders of Administrative Expense Claims other than professionals fees shall be required to file with the Bankruptcy Court and serve on the Debtors and counsel to the Prepetition Collateral Agent requests for payment on or before the thirtieth (30th) day after the Confirmation Date (the "Administrative Expense Bar Date") or forever be barred from submitting any request on account of such Administrative Expense Claim. The Debtors and the Prepetition Collateral Agent shall have thirty (30) days (or such longer period as may be allowed by order of the Bankruptcy Court) following the Administrative Expense Bar Date to review and object to such Administrative Expense Claims.

All applications for allowance and payment of professional fees for services rendered and reimbursement of expenses incurred in connection with the Chapter 11 Cases prior to the Effective Date are Administrative Expense Claims and shall be filed with the Bankruptcy Court within sixty (60) days after the Confirmation Date (the "Professional Fee Bar Date"). Any such application not filed within sixty (60) days after the Confirmation Date shall be deemed waived and the Holder of such Claim shall be forever barred from receiving payment on account thereof.

The notice of Confirmation to be delivered pursuant to Bankruptcy Rules 2002(c)(3) and 2002(f) shall set forth such date and shall constitute notice of the Administrative Expense Bar Date and the Professional Fee Bar Date. The Debtors, the Professionals, the Liquidating Trustee and the Prepetition Collateral Agent shall have thirty (30) days (or such longer period as may be allowed by order of the Bankruptcy Court) following the Administrative Expense Bar Date or the Professional Fee Bar Date, as applicable, to review and object to such requests for payment or applications for professional fees.

**D.      Classification and Treatment of Debtors' Claims and Equity Interests.**

The categories of Claims and Equity Interests and their treatment listed below classify Claims and Equity Interests for all purposes, including voting, confirmation and distribution

pursuant to the Plan, except as otherwise provided herein or in the Plan, and pursuant to Sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or Equity Interest shall be deemed classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class. A Claim or Equity Interest is in a particular Class only to the extent that such Claim or Equity Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date.

The classification of Claims and Equity Interests against the Debtors pursuant to the Plan is as follows:

| **Class** | **Status** | **Voting Rights** |
|---|---|---|
| Class 1 (Priority Non-Tax Claims) | Unimpaired | Not entitled to Vote - Deemed to accept Plan |
| Class 2 (Southwest Exchange Claims) | Unimpaired | Not entitled to Vote - Deemed to accept Plan |
| Class 3 (Senior Lender Secured Claims) | Impaired | Entitled to Vote |
| Class 4 (Senior Lender Deficiency Claims) | Impaired | Entitled to Vote |
| Class 5 (General Unsecured Claims) | Impaired | Entitled to Vote |
| Class 6 (Interdebtor Claims) | Impaired | Not entitled to Vote - Deemed to reject Plan |
| Class 7 (Non-Debtor Subsidiary Claims) | Impaired | Not entitled to Vote - Deemed to reject Plan |
| Class 8 (Equity Interests and Stock Claims) | Impaired | Not entitled to Vote - Deemed to reject Plan |

The classification and treatment of Claims against, and Equity Interests, in the Debtors are set forth in detail in the Plan. A summary of that treatment is provided below.

1.      Class 1: Priority Non-Tax Claims.

Class 1 consists of Allowed Claims entitled to priority under Section 507(a)(3), (4), (5), (6) or (7) of the Bankruptcy Code.

Class 1 Claims are Unimpaired by the Plan and the Holders of Allowed Class 1 Claims are deemed to accept the Plan and therefore not entitled to vote. Within the time period provided in Section 6.5(a)(1) of the Plan, each Holder of an Allowed Priority Non-Tax Claim shall receive

from the Debtors: (A) Cash equal to the amount of such Allowed Priority Non-Tax Claim, or (B) such other treatment which the Debtors, in consultation with the Prepetition Collateral Agent, and the Holder of such Allowed Priority Non-Tax Claim have agreed upon in writing

2. <u>Class 2: Southwest Exchange Claims.</u>

Class 2 consists of all Southwest Exchange Claims against the Debtors. Southwest Exchange Claims are any Claims by (a) the Receiver, any of the Southwest Exchange Receivership Entities, any other entity subject to the Receiver's control, or any Insider of such entities; (b) all persons and entities that (i) were customers of SWX or QES, (ii) directly or indirectly transferred any assets to or deposited any assets with SWX or QES, or (iii) directly or indirectly suffered any loss arising out of, in connection with, or in any way related to the failure of SWX or QES to make payments or transfers of assets to their customers; or (c) any beneficiary of the Receiver's asserted claims against any Debtor and/or any property of the Debtors' estates, any Non-Debtor Subsidiary and/or any property of a Non-Debtor Subsidiary, or any Senior Lender, including, without limitation, the claims asserted in the Receiver Adversary Proceedings, similar claims against such property, and/or claims against any Debtor or any Debtor estate, including any holder of a claim against any of the Southwest Exchange Receivership Entities, or any other entity subject to the Receiver's control, or any Insider of such entities or any entity claiming by or through the Receiver's estate. For the avoidance of doubt, this definition shall not be construed to include a Claim held by the Senior Lenders.

Assuming the Southwest Exchange Settlement Orders are obtained, including the Bankruptcy Settlement Order, and the Receiver Settlement Amount is paid to the Receiver as Receiver Settlement Trustee, all Southwest Exchange Claims will be deemed fully settled and satisfied. In consideration for the receipt of the benefit of the settlement pursuant to the Bankruptcy Settlement Order and this Plan, all such Claims will be deemed to have been withdrawn and expunged and the claimants with respect to such Claims will not be entitled to receive any Distribution or payments of any kind on account of such Claims under this Plan.

3. <u>Class 3: Senior Lender Secured Claims.</u>

Class 3 consists of the Senior Secured Noteholder Claims which are Allowed Secured Claims under and pursuant to this Plan in the aggregate amount of $57,071,384.00.

Class 3 Claims are Impaired by the Plan and the Holders of Class 3 Claims are entitled to vote on the Plan. Within the time period provided in Section 6.5(a)(6) of the Plan, the Debtors shall deliver the Distributable Cash to the Prepetition Collateral Agent for Pro Rata Distribution to each of the Holders of Allowed Senior Lender Secured Claims.

4. <u>Class 4: Senior Lender Deficiency Claims.</u>

Class 4 consists of all Senior Lender Deficiency Claims against the Debtors. The Senior Lender Deficiency Claims are the Allowed Deficiency Claims of the Senior Lenders arising under and pursuant to the Senior Lender Notes, which is an Allowed Deficiency Claim in an amount equal to the difference between (i) the Allowed Senior Lender Secured Claim, and (ii) the Distributable Cash actually applied to reduce the Senior Lender Secured Claim pursuant to Section 6.5(a)(6) of the Plan.

Class 4 Claims are Impaired by the Plan and the Holders of Class 4 Claims are entitled to vote on the Plan. At the times and in the manner provided in Section 6.5(b) and Article VII of the Plan, the Liquidating Trustee shall deliver the Senior Lender Litigation Proceeds and the proceeds of the PIP PMA received from the Liquidating Trust pursuant to Section 6.6(i) of the Plan, if any, to the Prepetition Collateral Agent for Pro Rata Distribution to each of the Holders of Allowed Senior Lender Deficiency Claims. No Holder of Class 4 Claims shall receive any share or part of the D&O Settlement Amount.

5.      Class 5: General Unsecured Claims.

Class 5 consists of all Allowed General Unsecured Claims against the Debtors. A General Unsecured Claim is a Claim against a Debtor that is not a Priority Tax Claim, Administrative Expense Claim, Priority Non-Tax Claim, Senior Lender Secured Claim, Senior Lender Deficiency Claim, Southwest Exchange Claim, Interdebtor Claim, Non-Debtor Subsidiary Claim, Equity Interest or Stock Claim.

Class 5 Claims are Impaired by the Plan and the Holders of Class 5 Claims are entitled to vote on the Plan. At the times and in the manner provided in Section 6.5(b) and Article VII of the Plan and subject to Section 6.6(i)(2) of the Plan, the Liquidating Trustee shall distribute to each Holder of an Allowed General Unsecured Claim: (i) its Pro Rata share of the General Unsecured Cash Payment; (ii) its Pro Rata share of the D&O Settlement Amount; and (iii) its Pro Rata share of the General Unsecured Creditors Litigation Proceeds and the proceeds of the PIP PMA received from the Liquidating Trust pursuant to Section 6.6(i) of the Plan, if any; provided, however, that no Holder of an Allowed General Unsecured Claim shall be entitled to receive more than the full amount of such Allowed Claim.

6.      Class 6: Interdebtor Claims.

Class 6 consists of all Interdebtor Claims against the Debtors. Interdebtor Claims are any Claims by a Debtor against another Debtor.

Because Class 6 is to receive no Distribution under the Plan, Holders of Class 6 Claims are deemed to reject the Plan and, therefore, are not entitled to vote on the Plan. There shall be no Distribution or payments of any kind to Holders of the Interdebtor Claims.

7.      Class 7: Non-Debtor Subsidiary Claims.

Class 7 consists of all Non-Debtor Subsidiary Claims against the Debtors. Non-Debtor Subsidiary Claims are the Claims of any direct and/or indirect subsidiaries, whether active or inactive, of MediCor that have not filed a Chapter 11 Case.

Because Class 7 is to receive no Distribution under the Plan, Holders of Class 7 Claims are deemed to reject the Plan and, therefore, are not entitled to vote on the Plan. There shall be no Distribution or payments of any kind to Holders of the Non-Debtor Subsidiary Claims.

8.      Class 8: Equity Interests and Stock Claims.

Class 8 consists of Equity Interests and Stock Claims. Because Class 8 is to receive no Distribution under the Plan, Holders of Class 8 Equity Interests and Stock Claims are deemed to reject the Plan and, therefore, are not entitled to vote on the Plan. A Stock Claim is any Claim with respect to an Equity Interest of the kind described in Section 510(b) of the Bankruptcy Code.

On the Effective Date, all Equity Interests shall be deemed canceled and of no force or effect, and the Holders of Stock Claims shall not be entitled to receive or retain any property on account of such Claims. Without limiting the generality of the foregoing, all rights or Claims of any Holders of Equity Interests with respect to dividends, distributions, voting rights, liquidation preferences or presumptive rights to subscribe for securities, or other rights or Claims with respect to such Equity Interests, whether arising under applicable law, certificate(s) of incorporation, agreement or otherwise, also shall be deemed extinguished, canceled and of no force or effect on the Effective Date. There shall be no Distribution or payment of any kind to Holders of Equity Interests or Stock Claims.

**E.      Means of Implementing the Plan.**

1.      _Implementation on the Effective Date._  The Plan shall be implemented on the Effective Date.

2.      _Substantive Consolidation of Debtors._  Pursuant to Section 6.2 of the Plan, on the Confirmation Date, the Estates of MediCor Ltd., International Integrated Incorporated, International Integrated USA Incorporated, MediCor Management, Inc., MediCor Development Company, MediCor Aesthetics, III Acquisition Corporation d/b/a PIP.America, and Intellectual Property International, Inc. shall be deemed to be substantively consolidated solely for purposes of voting on, and making Distributions under the Plan, and (i) all assets and liabilities of the Debtors shall be deemed to be merged, (ii) each obligation of any Debtor shall be deemed to be an obligation of all of the Debtors, (iii) a Claim against any one of the Debtors shall be deemed to be a Claim against all of the Debtors for all purposes, including, but not limited to, Distributions as provided under the Plan; (iv) each Claim filed in the Chapter 11 Case of any Debtor shall be deemed to be filed against all of the Debtors in accordance with the substantive consolidation of the assets and liabilities of the Debtors, (v) all transfers, disbursements and distributions made by any Debtor shall be deemed to be made by all of the Debtors and (vi) all Interdebtor Claims of the Debtors shall be canceled and deemed satisfied. Holders of Allowed Claims in each Class established pursuant to the Plan shall be entitled to the treatment set forth in the Plan for such Class without regard to which Debtor was originally liable for such Claim. Such substantive consolidation shall not (other than for the foregoing purposes) affect the legal and corporate structure of the Debtors. Notwithstanding such substantive consolidation, each Debtor shall be responsible for the payment of U.S. Trustee fees until such Debtor's Chapter 11 Case is closed.

3.      _Process for Orderly Wind Up of the Debtors' Estates, Consummation of Plan and Closing of Estates._  From and after the Confirmation Date, the Debtors shall continue in existence for the limited purpose of (i) winding up their affairs as expeditiously as reasonably possible, (ii) liquidating, by conversion to Cash or other methods, any remaining assets of their

Estates, as expeditiously as reasonably possible, (iii) administering the Plan, (iv) filing appropriate tax returns, and (v) dissolving or otherwise finally resolving their affairs.

From and after the Confirmation Date, and subject to the occurrence of the Effective Date, the Debtors may, in consultation with the Prepetition Collateral Agent, but without further judicial review or order of the Court, use, sell, assign, transfer, abandon or otherwise dispose of at a public or private sale any of the Remaining Assets for the purpose of liquidating and converting such Assets to Cash, making Distributions and fully consummating the Plan. Any proceeds obtained from the liquidation or conversion of the Remaining Assets shall be deemed to be Distributable Cash and shall be transferred to the Prepetition Collateral Agent for Distribution Pro Rata to the Holders of Allowed Senior Lender Secured Claims in accordance with the provisions of the Plan and the Confirmation Order. The Debtors may retain additional professionals (including any professional retained in the Chapter 11 Cases) to assist them in their duties with the consent of the Prepetition Collateral Agent. The Debtors shall be authorized to perform all actions required to consummate the Plan and for closing of the Chapter 11 Cases, including but not limited to the filing of any post-confirmation tax returns that may be required and applying for a final decree pursuant to Section 350 of the Bankruptcy Code at the expense of the Debtors.

4.     Funding for the Plan.  The Plan will be funded from the Debtors' available Cash, the Eurosilicone Escrow Funds and the Biosil Escrow Funds.  The Debtors' available Cash, the Eurosilicone Escrow Funds and the Biosil Escrow Funds are the cash collateral of the Senior Lenders, and the Senior Lenders have agreed to carve out and forgo a portion of their recovery on account of the Allowed Senior Lender Secured Claims in order to transfer the General Unsecured Cash Payment, the Litigation Fund Payment, and the Distribution of the General Unsecured Creditors Litigation Proceeds and the proceeds of the PIP PMA to the Liquidating Trust for the benefit of Holders of Allowed General Unsecured Claims on the terms set forth in this Plan.

5.     Timing of Distributions and Establishment of Reserves

The Plan sets forth the certain time periods for the making of Distributions and the establishment of Reserves under the Plan.

(a)     Transfers by the Debtors.

On the Effective Date of the Plan and prior to making any Distributions, the Debtors shall establish the Disputed Administrative, Priority Tax and Priority Non-Tax Claims Reserve (discussed below) and shall transfer thereto the amount of Cash as deemed necessary by the Debtors, with the consent of the Prepetition Collateral Agent, to fund the Disputed Administrative, Priority Tax and Priority Non-Tax Claims Reserve.  The Debtors will also establish the Plan Expense Reserve and transfer to the Plan Expense Reserve the amount of Cash as deemed necessary by the Debtors, with the consent of the Prepetition Collateral Agent, to adequately fund the administration of the Plan and the winding-down and closing of the Chapter 11 Cases on and after the Effective Date.  The Plan Expense Reserve will be used by the Debtors, with the consent of the Prepetition Collateral Agent, to pay the fees and expenses incurred in the course of implementing the Plan including, but not limited to, U.S. Trustee fees,

unpaid professional fees, and unpaid taxes and to pay insurance and other expenses incurred in the ordinary course of business in maintaining and disposing of the Remaining Assets of the Debtors (but not including the fees and expenses to be funded from the Liquidating Trust Expense Fund).

The Plan further provides that the Debtors will pay the Allowed Administrative Expense Claims, Allowed Priority Non-Tax Claims and the Allowed Priority Tax Claims on the later of the Effective Date, the date on which such a Claim becomes an Allowed Claim by Final Order or by agreement of the parties or as soon as reasonably practicable thereafter, the date on which, in the ordinary course of business, such Allowed Claim becomes due, or on such other date as may be agreed upon between the Debtors, in consultation with the Prepetition Collateral Agent, and the Holder of such Allowed Claim. Additionally, on the Effective Date of this Plan, (i) the Prepetition Collateral Agent will be deemed to have carved out from its Cash Collateral and deemed to have authorized the Debtors to transfer and the Debtors shall transfer to the Liquidating Trustee: (a) the General Unsecured Cash Payment, and (b) the Litigation Fund Payment and, (ii) as may be necessary, the Debtors and/or the Committee shall facilitate the transfer of any Litigation Proceeds, including, without limitation, the D&O Settlement Amount, if received or collected prior to the Effective Date, to the Liquidating Trust. The Debtors and the Senior Lenders shall have no further obligation to provide any funding to pay the expenses of the Liquidating Trust or otherwise, other than making the Litigation Fund Payment. On the Effective Date of the Plan, the Debtors will also transfer the Litigation Claims and the PIP PMA to the Liquidating Trust.

On the Effective Date and after making the transfers set forth in Section 6.5(a) of the Plan, the Debtors will transfer all remaining Distributable Cash to the Prepetition Collateral Agent for Distribution Pro Rata to the Holders of Allowed Senior Lender Secured Claims in accordance with the provisions of the Plan and the Confirmation Order.

(b)     Transfers by the Liquidating Trustee.

The Plan requires the Liquidating Trustee to establish the Liquidating Trust Expense Reserve and transfer the Litigation Fund Payment to the Liquidating Trust Expense Reserve (discussed below) as soon as reasonably practicable but not to exceed five (5) days after the receipt of the Litigation Fund Payment from the Debtors. The Plan also requires the Liquidating Trustee to establish the Disputed General Unsecured Claims Reserve as soon as reasonably practicable but not to exceed one hundred twenty (120) days after the receipt of the General Unsecured Cash Payment from the Debtors and transfer the amount of Cash necessary to fund the Disputed General Unsecured Claims Reserve to the Disputed General Unsecured Claims Reserve from the General Unsecured Cash Payment, as calculated pursuant to Section 7.4 of the Plan. As soon as reasonably practicable but not to exceed one hundred eighty (180) days after the establishment of the Disputed General Unsecured Claims Reserve, the Liquidating Trustee shall distribute the balance of the General Unsecured Cash Payment Pro Rata to the Holders of Allowed General Unsecured Claims in accordance with the provisions of the Plan and the Confirmation Order.

Pursuant to the Plan, the Committee designates the Liquidating Trust to receive the D&O Settlement Amount and the Liquidating Trustee may receive such D&O Settlement Amount pursuant to this Plan in the Liquidating Trust.

Upon the receipt of any Litigation Proceeds, the Liquidating Trustee will establish the Litigation Proceeds Reserve (discussed below) and transfer the Litigation Proceeds to the Litigation Proceeds Reserve, subject to the payment of the reasonable fees and expenses of the Liquidating Trustee as set forth in Section 6.6(i)(2) of the Plan.

On each of the Interim Distribution Dates and the Final Distribution Date, subject to the making of appropriate reserves in respect of Litigation Claims, including anticipated fees and expenses necessary in the Liquidating Trustee's discretion to prosecute or otherwise dispose of other Litigation Claims, out of the Litigation Proceeds, the Litigation Proceeds will be distributed by the Liquidating Trustee to the Holders of Allowed General Unsecured Claims and the Prepetition Collateral Agent pursuant to the formula set forth in Section 6.6(i)(3)of the Plan; provided, however, that in no event shall the aggregate distributions to a Holder of an Allowed Claim exceed the full amount of such Allowed Claim. To the extent that the Allowed General Unsecured Claims are satisfied in full, the Litigation Proceeds shall thereafter be paid to the Prepetition Collateral Agent for Distribution Pro Rata to the Holders of Allowed Senior Lender Deficiency Claims.

On each of the Interim Distribution Dates and the Final Distribution Date, the Liquidating Trustee shall distribute the Surplus Distributions to Holders of Allowed General Unsecured Claims on a Pro Rata basis if the Liquidating Trustee deems such a distribution to be efficient and practicable.

Notwithstanding the foregoing, nothing in the Plan or the Confirmation Order, or any related document, agreement, instrument or order shall prohibit the Liquidating Trustee from using Litigation Proceeds and other reserve amounts to fund Liquidating Trust Expenses. The Liquidating Trustee may file a motion to extend any deadlines for the making of Distributions or reserves under the Plan prior to the occurrence of any such deadlines, which are automatically extended after the filing of such motion pending the entry of an order by the Bankruptcy Court extending any subject deadline.

(c)     Transfers of Remaining Funds.

The Plan provides that any Cash remaining in the Plan Expense Reserve or the Disputed Administrative, Priority Tax and Priority Non-Tax Claims Reserve, after all Disputed Administrative, Priority Tax and Priority Non-Tax Claims have been resolved and the costs of the Debtors have been fully paid, will be paid to the Prepetition Collateral Agent for Distribution Pro Rata to the Holders of Allowed Senior Lender Secured Claims in accordance with the provisions of this Plan and the Confirmation Order.

Except as otherwise provided for in the Plan, upon the dissolution of the Liquidating Trust after the final Distributions to the beneficiaries of the Liquidating Trust are made, any Cash remaining in the Liquidating Trust Expense Reserve or the Litigation Proceeds Reserve will be deemed to be Litigation Proceeds and will be distributed in accordance with the provisions of

this Plan and the Confirmation Order. If there are any residual Unclaimed Distributions at the time of such dissolution, such residual Unclaimed Distributions shall be paid to the Prepetition Collateral Agent Pro Rata on behalf of the Senior Lenders, free of any restrictions thereon and notwithstanding any federal or state escheat laws to the contrary.

6. The Liquidating Trust.

On the Effective Date, the Debtors and/or the Committee, on their own behalf and on behalf of Holders of Allowed Claims in Classes 4 and 5, will execute the Liquidating Trust Agreement and take all other steps necessary to establish the Liquidating Trust. The Committee shall appoint the Liquidating Trustee, who shall be retained effective as of the Effective Date, and two trustees of the Liquidating Trust Board. The Prepetition Collateral Agent shall appoint the third trustee of the Liquidating Trust Board. The names of the Liquidating Trustee and the trustees of the Liquidating Trust Board will be disclosed in the Plan Supplement. Pursuant to this Plan and the Liquidating Trust Agreement, the Liquidating Trustee and each of the Persons serving on the Liquidating Trust Board shall act in a fiduciary capacity on behalf of the interests of all Holders of Allowed Senior Lender Deficiency Claims and all Holders of Allowed General Unsecured Claims that will receive Distributions pursuant to the terms of the Plan. The simultaneous appointment of a Person on the Committee and the Liquidating Trust Board shall be permissible. In the event of any conflict between the terms of Section 6.6 of the Plan and the terms of the Liquidating Trust Agreement, the terms of the Liquidating Trust Agreement shall govern.

Upon the Effective Date, the Debtors and/or the Committee shall transfer or cause to be transferred to the Liquidating Trust: (i) all of their rights, title, and interests in the Litigation Claims and the proceeds thereof, (ii) the D&O Settlement Amount and all of their rights, title, and interests in the D&O Settlement Agreement, (iii) at the deemed direction of the Prepetition Collateral Agent as a carve-out from the Senior Lenders' cash collateral, the General Unsecured Cash Payment, (iii) at the deemed direction of the Prepetition Collateral Agent as a carve-out from the Senior Lenders' cash collateral hereunder, the Litigation Fund Payment, and (iv) all of their rights, title, and interests in the PIP PMA and the proceeds thereof (collectively, the "Liquidating Trust Assets") and title to the Liquidating Trust Assets shall vest in the Liquidating Trust free and clear of all Liens, Claims and Interests, except as expressly provided in the Plan.

The Litigation Claims may be asserted against any Entity except those Entities receiving an express, written release under the Plan or pursuant to other Order of the Bankruptcy Court. Without limitation, the Litigation Claims include: (i) the Debtor D&O Claims including claims against Donald McGhan, Jim J. McGhan, Marc S. Sperberg, Theodore R. Maloney, Thomas R. Moyes, Samuel Clay Rogers, Paul R. Kimmel, Thomas Y. Hartley, Robert Forbuss, and Ikram Kahn for certain breaches of duty, aiding and abetting breaches of duty, and other related causes of action in connection with, arising from or relating to each such Person's service as a Debtor director or officer, and related claims against insurances and insurers (for the avoidance of doubt, the foregoing shall not include any claims of the Senior Lenders, Receiver, Southwest Exchange Receivership Entities, Members of the Settlement Class, Class Representative Plaintiffs, and Opt-Out Individual Plaintiffs against any past or present directors or officers of the Debtors and applicable insurances and insurers); (ii) claims in connection with, arising from or relating to (y) trade and note receivables owed certain Debtors by PIP France, and (z) agreements between

Debtor, III Acquisition Corporation, d/b/a PIP.America and PIP France; and (iii) any Entity identified in each Debtor's Statement of Financial Affairs as having received an actionable transfer under Chapter 5 of the Bankruptcy Code other than those Entities receiving an express, written release under the Plan or pursuant to other Order of the Bankruptcy Court. As discussed above, it is anticipated that the Liquidating Trustee will also pursue the claims against Greenberg & Company.

As set forth in more detail in the Liquidating Trust Agreement, the responsibilities of the Liquidating Trustee shall include, but shall not be limited to: (i) the making of Distributions as contemplated in the Plan; (ii) establishing and maintaining the Disputed General Unsecured Claims Reserve, the Litigation Proceeds Reserve, and the Liquidating Trust Expense Reserve in accordance with the terms of the Plan; (iii) investigating, enforcing, settling, compromising, prosecuting and filing the Litigation Claims; (iv) conducting the analysis of General Unsecured Claims and objecting to, settling, compromising, disputing and prosecuting Disputed General Unsecured Claims; (v) filing appropriate tax returns, each in the exercise of its fiduciary obligations; (vi) retaining such professionals as are necessary and appropriate in furtherance of such fiduciary obligations; and (vii) recovering, collecting or receiving any proceeds from or on account of the PIP PMA.

The Liquidating Trustee may invest the Liquidating Trust Assets and assets in the Disputed General Unsecured Claims Reserve and the Liquidating Trust Expense Reserve (including any earnings thereon or proceeds therefrom) as permitted by Section 345 of the Bankruptcy Code or as otherwise approved by the Bankruptcy Court. The Liquidating Trustee may also employ Professionals, including, without limitation, in his or her discretion, counsel for the Debtors or counsel for the Committee. There shall be no bonding of the Liquidating Trustee.

Any and all Litigation Claims accruing to or assertable by the Debtors, shall remain Assets of the Estates pursuant to Section 1123(b)(3)(B) of the Bankruptcy Code and on the Effective Date shall be transferred to and vest in the Liquidating Trust. Pursuant to Section 1123(b)(3)(B) of the Bankruptcy Code, only the Liquidating Trust and the Liquidating Trustee shall have the right to pursue or not to pursue, or, subject to the terms of the Plan and the Liquidating Trust Agreement, compromise or settle any Litigation Claims owned or held by the Debtors or their Estates as of the Effective Date. From and after the Effective Date, the Liquidating Trust and the Liquidating Trustee may commence, litigate, and settle any Litigation Claims or rights to payment or claims that belong to the Debtors that may be pending on the Effective Date or instituted by the Liquidating Trust and Liquidating Trustee after the Effective Date, except as otherwise expressly provided in the Plan and the Liquidating Trust Agreement. Other than as set forth therein, no other Person may pursue such Litigation Claims after the Effective Date. The Liquidating Trustee shall be deemed hereby substituted as plaintiff, defendant, or in any other capacity for either the Committee or each Debtor in any action pending before the Bankruptcy Court that relates to a Litigation Claim without the need for filing any motion for such relief. In connection with the above-described Litigation Claims, any attorney-client privilege, work-product privilege, or other privilege or immunity attaching to any documents or communications (whether written or oral) shall also exist for the benefit of the Liquidating Trust and shall vest in the Liquidating Trustee and its representatives, and shall also be preserved for and as to the Debtors. The Liquidating Trustee is authorized to take all necessary actions to benefit from such privileges. The Bankruptcy Court shall retain jurisdiction

to adjudicate any and all Litigation Claims and approve any such settlement, whether commenced prior to or after Confirmation of the Plan and the Effective Date.

Fees and expenses incurred by the Liquidating Trustee shall be paid from the Liquidating Trust Expense Reserve in accordance with Section 6.6(i)(2) of the Plan.

Within the time periods provided in Section 6.5 of the Plan and in accordance with the Plan and the Liquidating Trust Agreement, the Liquidating Trustee shall distribute all Liquidating Trust Assets on hand and permitted investments, except such amounts as are necessary to maintain the Liquidating Trust Expense Reserve in accordance with the terms of the Plan. The Liquidating Trustee may withhold from amounts distributable to any Person any and all amounts, determined in the Liquidating Trustee's reasonable sole discretion, to be required by any law, regulation, rule, ruling, directive or other governmental requirement.

As soon as practicable after the Liquidating Trustee receives any Litigation Proceeds (excluding the D&O Settlement Amount), the Liquidating Trustee shall pay the first $100,000 received to the Prepetition Collateral Agent for Distribution Pro Rata to the Holders of the Senior Lender Secured Claims to reimburse the Litigation Fund Payment. Thereafter, the Liquidating Trustee is authorized to pay reasonable fees and expenses of the Liquidating Trust incurred in connection with investigating, prosecuting and/or settling Litigation Claims (including, without limitation, such reasonable fees and expenses of the Liquidating Trust Professionals in accordance with the provisions of Section 6.10(b) of the Plan) from the Litigation Proceeds. As soon as practicable after the Liquidating Trustee receives any Litigation Proceeds in excess of $100,000, the Liquidating Trustee shall establish the Litigation Proceeds Reserve and shall deposit all remaining Litigation Proceeds after payment of such reasonable fees and expenses into the Litigation Proceeds Reserve. The fees and expenses of the Liquidating Trust incurred in connection with investigating, reconciling, objecting to and/or settling General Unsecured Claims shall be paid out of the D&O Settlement Amount.

The Liquidating Trustee shall pay fifty percent (50%) of any Litigation Proceeds held in the Litigation Proceeds Reserve (the "Distributable Litigation Proceeds") to the Prepetition Collateral Agent for Distribution Pro Rata to the Holders of Allowed Senior Lender Deficiency Claims; and (b) distribute fifty percent (50%) of the Distributable Litigation Proceeds Pro Rata to the Holders of Allowed General Unsecured Claims in accordance with the provisions of the Plan (the foregoing funds payable to the Prepetition Collateral Agent, the "Senior Lender Litigation Proceeds", and the foregoing funds payable to the Holders of Allowed General Unsecured Claims, the "General Unsecured Creditors Litigation Proceeds"). Notwithstanding the foregoing, the D&O Settlement Amount is payable only: (i) to holders of Allowed General Unsecured Claims, which are Liquidating Trust beneficiaries, and (ii) on account of Liquidating Trustee fees and expenses specified in Section 6.6(i)(2) of the Plan..

The Liquidating Trust shall be dissolved no later than three (3) years from the Effective Date unless either: (i) the Bankruptcy Court, upon a motion filed prior to the third anniversary (or the end of any extension period approved by the Bankruptcy Court) (the filing of which shall automatically extend the term of the Liquidating Trust pending the entry of an order by the Bankruptcy Court granting or denying the motion), determines that a fixed period extension (not to exceed two years, together with any prior extensions, without a favorable letter ruling from the

IRS that any further extension would not adversely affect the status of the Liquidating Trust as a liquidating trust for federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Liquidating Trust Assets, or (ii) the Prepetition Collateral Agent consents in writing to such an extension. After (a) the Final Distribution of all Litigation Proceeds, the Disputed General Unsecured Claims Reserve, the D&O Settlement Amount and the Liquidating Trust Expense Reserve pursuant to this Plan, (b) the filing by or on behalf of the Liquidating Trust of a certification of dissolution with the Bankruptcy Court in accordance with this Section, the Liquidating Trust shall be deemed dissolved for all purposes without the necessity for any other or further actions.

The Liquidating Trustee shall, in accordance with the Liquidating Trust Agreement, serve in such capacity through the earlier of (i) the date the Liquidating Trust, the Disputed General Unsecured Claims Reserve and the Liquidating Trust Expense Reserve are dissolved and (ii) the date such Liquidating Trustee resigns, is terminated or is otherwise unable to serve; provided, however, that, in the event that the Liquidating Trustee resigns, is terminated or is unable to serve, then the Liquidating Trust Board shall have the right to select a successor who shall be appointed as the Liquidating Trustee and shall serve in such capacity until the Liquidating Trust, the Disputed General Unsecured Claims Reserve and the Liquidating Trust Expense Reserve are dissolved or until such Liquidating Trustee resigns, is replaced or is terminated and no successor is appointed.

The Liquidating Trust shall be established for the sole purpose of administering and distributing the Liquidating Trust Assets, in accordance with Treasury Regulation Section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business. The Liquidating Trust shall be a grantor trust and shall be assumed to have no tax liabilities.

Neither the Liquidating Trustee, the Liquidating Trust Board, their respective members, designees or professionals, or any duly authorized agent or representative of the Liquidating Trust, the Liquidating Trustee or the Liquidating Trust Board, nor their respective employees or members, shall be liable for the act or omission of any other member, designee, agent, or representative of such Liquidating Trustee or Liquidating Trust Board, nor shall such Liquidating Trustee, Liquidating Trust Board, or any member of the Liquidating Trust Board be liable for any act or omission taken or not taken in its capacity as Liquidating Trustee, Liquidating Trust Board or member of such Board, respectively, other than for specific acts or omissions resulting from such Liquidating Trustee's, Board's or such member's willful misconduct, gross negligence or fraud. Each of the Liquidating Trustee or the Liquidating Trust Board may, in connection with the performance of their functions, and in its sole and absolute discretion, consult with its attorneys, accountants financial advisors and agents, and shall not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinion rendered by such entities, regardless of whether such advice or opinions are provided in writing.

Notwithstanding such authority, neither the Liquidating Trustee nor the Liquidating Trust Board shall be under any obligation to consult with its attorneys, accountants, financial advisors and agents, and their determination not to do so shall not result in the imposition of liability on the Liquidating Trustee or the Liquidating Trust Board or their respective members and/or designees, unless such determination is based on willful misconduct, gross negligence or fraud. The Liquidating Trust shall indemnify and hold harmless the Liquidating Trustee, the

Liquidating Trust Board and any duly authorized member, agent or designee thereof (in their capacity as such), from and against and in respect of all liabilities, losses, damages, claims, costs, and expenses (including, without limitation, reasonable attorney's fees, disbursements and related expenses), which such entities may incur or to which such entities may become subject in connection with any action, suit, proceeding, or investigation brought by or threatened against such entities arising out of or due to their acts or omissions or consequences of such acts or omissions, with respect to the implementation or administration of the Liquidating Trust or the Plan or the discharge of their duties thereunder/hereunder; provided, however, that no such indemnification will made to such entities for actions or omissions as a result of their willful misconduct, gross negligence, or fraud.

On and after the Effective Date, the Liquidating Trust shall have no liability on account of any Claims or Interests except as set forth in the Plan and in the Liquidating Trust Agreement. All payments and all distributions made by the Liquidating Trustee under the Plan shall be in full and final satisfaction, settlement and release of all Claims against the Liquidating Trust; provided, however, that nothing contained in section 6.6(m) of the Plan, or in any other provision of this Plan, shall be deemed to constitute or result in a discharge of any Debtor under Bankruptcy Code Section 1141(d).

7.    Cancellation of Instruments and Stock.  Pursuant to Section 6.7 of the Plan, on the Effective Date, all instruments evidencing or creating any indebtedness or obligation of the Debtors, except such instruments that are authorized, issued or Reinstated under the Plan, shall be canceled and extinguished.  Additionally, as of the Effective Date, all Equity Interests, and any and all warrants, options, rights or interests with respect to Equity Interests that have been issued, or that have been authorized to be issued but that have not been issued, shall be deemed canceled and extinguished without any further action of any party; provided however, that the Senior Lender Notes shall continue in effect.  The Holders of or parties to the canceled notes, share certificates and other agreements and instruments shall have no rights arising from or relating to such notes, share certificates and other agreements and instruments or the cancellation thereof, except the rights provided pursuant to the Plan.  Notwithstanding any provision contained in the Plan to the contrary, the distribution provisions contained in each of the Senior Lender Notes shall continue in effect.

8.    Dissolution of Corporate Entities.  Pursuant to Section 6.8 of the Plan, upon the entry of the Confirmation Order by the Bankruptcy Court, all matters provided under the Plan involving the corporate structure of the Debtors shall be deemed authorized and approved without any requirement of further action by the Debtors, the Debtors' shareholders or the Debtors' boards of directors.  Each Debtor (and its boards of directors) shall dissolve or otherwise terminate their existence following the Effective Date.  Such dissolutions may be effected pursuant to this Plan by the entry of an Order of the Bankruptcy Court, which could be the Confirmation Order, or by the entry of an Order of another court of competent jurisdiction. Each of the Debtors will file the Confirmation Order with the official public office for keeping corporate records in their respective state of incorporation or organization or take such other actions as the Debtors deem appropriate to provide for the revocation of the corporate charter for each of the Debtors.  The Confirmation Order will provide that the Debtors will not be required to pay any outstanding or delinquent franchise taxes in order to effectuate the dissolution.  Each of the Debtors will file, if necessary, a Certification and Notice of Termination on Form 15 with

the Securities and Exchange Commission or take such other appropriate action as may be reasonably necessary and appropriate to terminate the registration of its securities.

9. <u>Post-Confirmation Professional Fees and Expenses.</u>  Professionals that perform post-Confirmation Date services for the Debtors shall provide monthly invoices to the Debtors and the Prepetition Collateral Agent describing the services rendered, and the fees and expenses incurred in connection therewith, on or before the 20th day following the end of the calendar month during which such services were performed.  Subject to Section 6.6(i)(2) of the Plan, Professionals who timely tender such invoices shall be paid by the Debtors for such services not less than ten (10) days after the submission to the Debtors and the Prepetition Collateral Agent by such Professionals of said monthly invoices, unless, within said ten (10) day period, a written objection to said payment is made.  To the extent a written objection to a Professional's monthly invoice cannot be resolved by the parties, payment of such invoice shall be made only upon Final Order of the Bankruptcy Court.

Professionals that perform post-Confirmation Date services for the Liquidating Trustee shall provide monthly invoices to the Liquidating Trustee and each trustee of the Liquidating Trust Board describing the services rendered, and the fees and expenses incurred in connection therewith, on or before the 20th day following the end of the calendar month during which such services were performed.  Professionals who timely tender such invoices shall be paid by the Liquidating Trustee for such services not less than ten (10) days after the submission to the Liquidating Trustee and each trustee of the Liquidating Trust Board by such professionals of said monthly invoices, unless, within said ten (10) day period, a written objection to said payment is made by the Liquidating Trustee or any trustee of the Liquidating Trust Board.  To the extent a written objection to a professional's monthly invoice cannot be resolved by the parties, payment of such invoice, shall be made only upon Final Order of the Bankruptcy Court.

10. <u>Disposition of Books and Records.</u>  After the Effective Date, the Debtors shall transfer all of the Debtors' books and records in their possession relating to the conduct of the Debtors' business prior to the Effective Date to the Liquidating Trustee.  Thereafter, the Liquidating Trustee shall grant the Debtors access to such books and records and provide such cooperation and assistance as shall be reasonably required to enable the Debtors to complete their respective legal, regulatory, fiduciary, and financial reporting requirements and to complete their respective tax returns.  The Liquidating Trustee shall be promptly reimbursed for the Liquidating Trustee's reasonable out-of-pocket expenses associated with requests made by the Debtors or other parties under Section 6.11 of the Plan, but no other charges shall be payable by the requesting party to the other party in connection with such requests.  Pursuant to Section 554(a) of the Bankruptcy Code, the Liquidating Trustee will be authorized, from time to time and upon the consent of the Debtors to the extent such consent can be reasonably obtained, to abandon or otherwise destroy documents and records (whether in electronic or paper format) that the Liquidating Trustee determines, in his reasonable business judgment, are no longer necessary to administration of the Chapter 11 Cases and the wind up of the Debtors' Estates.  The Liquidating Trustee shall be permitted to abandon or otherwise destroy such documents and records notwithstanding any federal, state or local law or requirement requiring the retention of the applicable documents or records.  The Liquidating Trustee will be permitted to abandon or destroy such documents and records without further application to the Bankruptcy Court or notice to any party other than the Debtors; <u>provided</u>, <u>however</u>, that, prior to the 30th day after the

Effective Date, the Prepetition Collateral Agent or any appropriate governmental authorities shall be permitted to request the retention of any such documents and records at their own expense.

**F.      Reserves and Distributions Under the Plan.**

**THE FOLLOWING IS A SUMMARY OF THE PROVISIONS GOVERNING RESERVES AND DISTRIBUTIONS UNDER THE PLAN AND IS QUALIFIED IN ITS ENTIRETY BY THE TERMS OF THE PLAN.**

1.      Provisions Governing Distributions, Generally.

The Plan provides that the Debtors and/or the Liquidating Trustee may employ or contract with other entities to assist in or make the Distributions required by the Plan, subject to the approval of the Prepetition Collateral Agent and in respect of the Liquidating Trustee, with the additional approval of the Liquidating Trust Board. Upon the making of any Distribution to Holders of Allowed Claims or the transfer of any payment to the Liquidating Trustee or the Prepetition Collateral Agent in accordance with the Plan, including but not limited to the payment of the Litigation Fund Payment and the General Unsecured Cash Payment, the Debtors, the Prepetition Collateral Agent or the Liquidating Trustee, as applicable, shall have no further obligations or liability to any party with respect to such Distribution or payment.

2.      Distributions by the Liquidating Trustee.

If, in the discretion of the Liquidating Trustee, there is insufficient available Cash to make a cost-efficient Distribution and the average Distribution to be made to each recipient of such Distribution would be less than Twenty-Five Dollars ($25.00), the Liquidating Trustee shall not be obligated to make a Distribution and such funds shall, in the Liquidating Trustee's discretion, be paid to the Prepetition Collateral Agent for Pro Rata Distribution to the Holders of Allowed Senior Lender Deficiency Claims.

3.      Establishment and Maintenance of Reserves for Disputed General Unsecured Claims.

The amount of Cash deposited into the Disputed General Unsecured Claims Reserve shall be equal to the percentage of Cash that Holders of Disputed General Unsecured Claims would be entitled under the Plan if such Disputed General Unsecured Claims were Allowed Claims in the amount of such Disputed General Unsecured Claim or such lesser amount as authorized by a Final Order. For the purposes of effectuating the provisions of this Section and the Distributions to Holders of Allowed General Unsecured Claims, the Liquidating Trustee may, at any time and regardless of whether an objection to a Disputed General Unsecured Claim has been brought, request that the Bankruptcy Court estimate, set, fix or liquidate the amount of such Disputed General Unsecured Claim pursuant to Section 502(c) of the Bankruptcy Code, in which event the amounts so estimated, fixed or liquidated shall be deemed the Allowed amounts of such Claims for purposes of Distribution under the Plan. In lieu of estimating, fixing or liquidating the amount of any Disputed General Unsecured Claim, the Bankruptcy Court may determine the amount to be reserved for such Disputed General Unsecured Claim (singularly or in the aggregate), or such amount may be fixed by an agreement in writing by and between the Liquidating Trustee and the Holder of a Disputed General Unsecured Claim.

4.     Objection Deadline; Prosecution of Objections; Resolution of Disputed General Unsecured Claims.

Except as otherwise provided for in the Plan, as soon as reasonably practicable, but in no event later than the Claims Objection Deadline (unless extended, after notice to those creditors who requested notice in accordance with Bankruptcy Rule 2002, by an Order of the Bankruptcy Court), the Debtors shall File Objections to Claims and serve such objections upon the Holders of each of the Claims to which Objections are made. The Liquidating Trustee shall have the sole authority to File Objections to General Unsecured Claims and shall likewise have authority hereunder to extend claims objection deadlines. Nothing contained in the Plan shall limit the rights of the Debtors or the Liquidating Trustee to object to Claims, if any, Filed or amended more than one hundred twenty (120) days after the Effective Date. The Debtors or the Liquidating Trustee, as applicable, shall be authorized to resolve all Disputed Claims by withdrawing or settling such Objections thereto, or by litigating to judgment in the Bankruptcy Court, or such other court having competent jurisdiction, the validity, nature, and/or amount thereof. If the Debtors or the Liquidating Trustee, as applicable, agree with the Holder of a Disputed Claim to compromise, settle, and/or resolve a Disputed Claim by granting such Holder an Allowed Claim in the amount of $100,000 or less, then the Debtors or the Liquidating Trustee, as applicable, may compromise, settle, and/or resolve such Disputed Claim without Bankruptcy Court approval. Otherwise, the Debtors or the Liquidating Trustee may only compromise, settle, and/or resolve such Disputed Claim with Bankruptcy Court approval.

The Holder of a Disputed General Unsecured Claim that becomes an Allowed Claim subsequent to the Effective Date shall receive a Distribution from the Disputed General Unsecured Claims Reserve as soon as practical following the date on which such Disputed General Unsecured Claim becomes an Allowed Claim pursuant to a Final Order or by agreement of the parties. Such Distributions shall be made in accordance with the Plan based upon the Distributions that would have been made to such Holder under the Plan if the Disputed General Unsecured Claim had been an Allowed Claim on or prior to the Effective Date. No Holder of a Disputed General Unsecured Claim shall have any Claim against the Disputed General Unsecured Claims Reserve, the Liquidating Trustee or the Debtors with respect to such Claim until such Disputed General Unsecured Claim shall become an Allowed Claim, and no Holder of a Disputed General Unsecured Claim shall have any right to interest, dividends or other Distribution on such Disputed General Unsecured Claim except as provided in Section 7.5 of the Plan.

To the extent that a Disputed General Unsecured Claim is not Allowed or becomes an Allowed Claim in an amount less than the Disputed Claim Amount, any excess of Cash in the Disputed General Unsecured Claims Reserve attributable to such Disputed Claim in excess of Cash actually distributed on account on such Disputed General Unsecured Claim shall be deemed Surplus Distributions. The Liquidating Trustee shall make a supplemental Distribution or Distributions of the Surplus Distributions to Holders of Allowed General Unsecured Claims on a Pro Rata basis within the time periods provided in Section 6.5 of the Plan.

5.     Delivery of Distributions and Undeliverable and Unclaimed Distributions.

Except as otherwise set forth in the Plan, Distributions to Holders of Allowed Claims shall be made (a) at the addresses set forth on the Proofs of Claim Filed by such Holders (or at the last known addresses of such Holders if no Proof of Claim is Filed or if the Debtors have been notified of a change of address), (b) at the addresses set forth in any written notices of address changes delivered to the Debtors or the Liquidating Trustee, or (c) if no Proof of Claim has been Filed and the Debtors or the Liquidating Trustee have not received a written notice of a change of address, at the addresses reflected in the Schedules, if any.

If the Distribution to any Holder of an Allowed Claim is returned to the Debtors or the Liquidating Trustee as undeliverable or is otherwise unclaimed, no more Distributions shall be made to such Holder unless and until the Debtors or the Liquidating Trustee are notified in writing of such Holder's then current address. The Debtors or the Liquidating Trustee shall make all Distributions that have become deliverable or have been claimed since the Distribution Date as soon as reasonably practicable after such Distribution has become deliverable.

Any Holder of an Allowed Claim that does not assert a claim pursuant to the Plan for an undeliverable or unclaimed Distribution within six (6) months after the Distribution Date shall be deemed to have forfeited its claim for such undeliverable or unclaimed Distribution and any subsequent Distribution on account of its Allowed Claim and shall be forever barred and enjoined from asserting any such claim for an undeliverable or unclaimed Distribution or any subsequent Distribution on account of its Allowed Claim against the Debtors, their Estates, the Liquidating Trust or their property. In such cases, any Cash share of Litigation Proceeds for Distribution on account of such claims for undeliverable or unclaimed Distributions or Cash Litigation Proceeds for any subsequent Distribution on account of such Allowed Claim (collectively, "Unclaimed Distributions") shall be: (i) paid fifty percent (50%) to the Prepetition Collateral Agent for Distribution Pro Rata to the Holders of Senior Lender Deficiency Claims, and (ii) paid fifty percent (50%) Pro Rata to Holders of Allowed General Unsecured Claims by the Liquidating Trustee (other than Holders waiving Distribution rights hereunder), free of any restrictions thereon and notwithstanding any federal or state escheat laws to the contrary, provided, however, any Unclaimed Distributions in respect of the D&O Settlement Amount shall be paid only to Holders of General Unsecured Claims who had received Distributions (subject to the rights of the Liquidating Trustee in respect of Section 6.6(i)(2) of the Plan regarding his/her expenses). Further, subject to Section 6.5(c)(2) of the Plan, in such cases, any Cash share of the General Unsecured Cash Payment allocable to Unclaimed Distributions shall be paid by the Liquidating Trustee Pro Rata to Holders of Allowed General Unsecured Claims other than Holders of such Claims waiving Distribution rights hereunder, in connection with Unclaimed Distributions, free of any restrictions thereon and notwithstanding any federal or state escheat laws to the contrary. Nothing contained in the Plan shall require the Debtors or the Liquidating Trustee to attempt to locate any Holder of an Allowed Claim. Notwithstanding the foregoing, any Unclaimed Distribution in respect of a Distribution on account of any Claim other than a General Unsecured Claim under this Plan shall be paid to the Prepetition Collateral Agent for Distribution Pro Rata to the Holders of Senior Lender Secured Claims, free of any restrictions thereon and notwithstanding any federal or state escheat laws to the contrary.

6.    Record Date for Distributions.    Under the terms of the Plan, the Distribution Record Date shall be the Confirmation Date. The Debtors or the Liquidating Trustee will have no obligation to recognize the transfer of, or the sale of any participation in, any Allowed Claim

that occurs after the close of business on the Distribution Record Date, and will be entitled for all purposes herein to recognize and distribute only to those Holders of Allowed Claims that are Holders of such Claims, or participants therein, as of the close of business on the Distribution Record Date. The Debtors or the Liquidating Trustee shall instead be entitled to recognize and deal for all purposes under the Plan with only those record holders stated on the official claims register as of the close of business on the Distribution Record Date.

7.  **Means of Cash Payment.**  Cash payments made pursuant to the Plan shall be in U.S. funds, by the means, including by check or wire transfer, determined by the Debtors or the Liquidating Trustee.  Cash payments to foreign creditors may be made, at the option of the Debtors or the Liquidating Trustee in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

8.  **Interest on Claims.**  Unless otherwise specifically provided for in the Plan, the Confirmation Order, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim.

9.  **No Distributions Pending Allowance.**  Notwithstanding any other provision of the Plan, no payments or Distributions by the Debtors or the Liquidating Trustee shall be made with respect to all or any portion of a Disputed Claim unless and until all Objections to such Disputed Claim have been settled or withdrawn by agreement of the parties or have been determined by Final Order, and the Disputed Claim, or some portion thereof, has become an Allowed Claim; provided however, that the Debtors may in their discretion pay any undisputed portion of a Disputed Administrative, Priority Tax and Priority Non-Tax Claim.

10.  **Withholding and Reporting Requirements.**  In connection with the Plan and all Distributions hereunder, the Debtors or the Liquidating Trustee shall, to the extent applicable, comply with all tax withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all Distributions hereunder shall be subject to any such withholding and reporting requirements.  The Debtors or the Liquidating Trustee shall be authorized to take any and all actions that may be reasonably necessary or appropriate to comply with such withholding and reporting requirements.  All persons holding Claims shall be required to provide any information necessary to effect information reporting and the withholding of such taxes.  Notwithstanding any other provision of the Plan, each Holder of an Allowed Claim that is to receive a Distribution pursuant to the Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Governmental Unit, including income, withholding and other tax obligations, on account of such Distribution.

11.  **Setoffs.**  As provided by Section 7.14 of the Plan, the Debtors or the Liquidating Trustee may, but shall not be required to, setoff against any Claim, and the payments or other Distributions to be made pursuant to the Plan in respect of such Claim, claims of any nature whatsoever that a Debtor may have against the Holder of such Claim; provided, however, neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors of any such claim that the Debtors may have against such Holder, unless otherwise agreed to in writing by such Holder and the Debtors or the Liquidating Trustee, as applicable.

12.     _De Minimis_ Distributions.  Pursuant to Section 7.15 of the Plan, notwithstanding any provision in the Plan to the contrary, no payment of less than Twenty-Five Dollars ($25.00) on account of any Allowed Claim, unless a specific request therefor is made in writing to the Debtors or the Liquidating Trustee on or before ninety (90) days after the Effective Date.  All Distributions not made pursuant to Section 7.15 of the Plan shall be treated as Unclaimed Distributions and otherwise subject to Section 7.7(c) of the Plan.

## G.     Executory Contracts, Leases and Pension Plans.

**THE FOLLOWING IS A SUMMARY OF THE PROVISIONS GOVERNING THE TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES UNDER THE PLAN AND IS QUALIFIED IN ITS ENTIRETY BY THE TERMS OF THE PLAN.**

As set forth in Article VIII of the Plan, all of the Debtors' executory contracts and unexpired leases will be deemed rejected on the Effective Date in accordance with, and subject to, the provisions and requirements of Sections 365 and 1123 of the Bankruptcy Code, except to the extent (a) the Debtors previously have assumed or rejected an executory contract or unexpired lease, or (b) prior to the Effective Date, the Debtors have Filed or File a motion to assume an executory contract or unexpired lease on which the Bankruptcy Court has not ruled.  Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such rejections pursuant to Sections 365(a) and 1123 of the Bankruptcy Code.  For the avoidance of doubt, the Assets comprising the PIP PMA are not executory and are not subject to assumption or rejection.

If the rejection of an executory contract or an unexpired lease by the Debtors results in damages to the other party or parties to such contract or lease, a Claim for such damages shall be forever barred and shall not be enforceable against the Debtors or any of them or their properties or agents, successors, or assigns, unless a Proof of Claim is filed with the Bankruptcy Court and served upon the Debtors and the Debtors by the earlier of: (a) thirty (30) days after receipt of notice of the Confirmation Date or (b) such other deadline as the Court has or may set for asserting a Claim for such damages.

## H.     Confirmation and Effective Date of the Plan.

1.     _Conditions Precedent to Confirmation._  Each of the following are conditions precedent to Confirmation:

(a)     The Southwest Exchange Settlement Orders, in a form and substance reasonably acceptable to the Debtors and the Prepetition Collateral Agent, shall have been entered and shall have become Final Orders.

(b)     The Bankruptcy Court shall have determined that the Debtors are duly authorized to take the actions contemplated in the Plan which approval and authorization may be set forth in the Confirmation Order.

2.     _Conditions Precedent to the Effective Date._  Each of the following are conditions precedent to the occurrence of the Effective Date:

(a)  The Confirmation Order, in a form and substance reasonably acceptable to the Debtors, the Prepetition Collateral Agent and the Committee, shall have been entered by the Bankruptcy Court and shall have become a Final Order.

(b)  At the deemed direction of the Prepetition Collateral Agent, the Debtors shall have delivered the Litigation Fund Payment and the General Unsecured Cash Payment, and as may be necessary, facilitated the transfer of any Litigation Proceeds, including, without limitation, the D&O Settlement Amount, collected or received prior to the Effective Date, to the Liquidating Trustee, in Cash or immediately available funds, pursuant to Section 6.5(a)(5) of the Plan

(c)  The Debtors shall have established the Disputed Administrative, Priority Tax and Priority Non-Tax Claims Reserve and the Plan Expense Reserve, pursuant to Sections 6.5(a)(2) and 6.5(a)(3)of the Plan.

(d)  All documents, instruments, and agreements provided under, or necessary to implement, the Plan shall have been executed and delivered by the applicable parties.

(e)  All other documents required to be Filed as an exhibit or schedule to the Plan, each in form and substance reasonably acceptable to the Debtors, the Prepetition Collateral Agent and the Committee, shall have been duly and validly executed and delivered by the parties thereto and all conditions to their effectiveness shall have been satisfied or waived.

3.  <u>Notice of Effective Date.</u>  On or before five (5) Business Days after the occurrence of the Effective Date, the Debtors shall mail or cause to be mailed to all Holders of Claims in Classes 3, 4 and 5 that are not Disallowed Claims a notice that informs such Persons of (a) the entry of the Confirmation Order, (b) the occurrence of the Effective Date, and (c) such other matters as the Debtors deem appropriate or as may be ordered by the Bankruptcy Court.

4.  <u>Waiver of Conditions Precedent to the Effective Date.</u>  The Debtors, with the written consent of the Prepetition Collateral Agent and the Committee, may at any time, without notice or authorization of the Bankruptcy Court, waive in writing any or all of the conditions precedent to the Effective Date, whereupon the Effective Date shall occur without further action by any Person; <u>provided</u>, <u>however</u>, that the conditions specified in Section 9.2(b) may not be waived.  The Debtors reserve the right to assert that any appeal from the Confirmation Order shall be moot after the Effective Date of the Plan.

## I.  **Effects of Confirmation of the Plan.**

1.  <u>Binding Effect.</u>

The Plan shall be binding upon and inure to the benefit of the Debtors, all present and former Holders of Claims and Equity Interests, and their respective successors and assigns, including, but not limited to, the Debtors.

2.  <u>Releases.</u>

(a)  <u>Releases by the Debtors for Post-Petition Conduct.</u>

Pursuant to Section 10.2(a) of the Plan, as of the Effective Date, for good and valuable consideration, the adequacy of which is confirmed by the Plan, the Debtors in their individual capacities and as debtors-in-possession will be deemed to release and forever waive all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action and liabilities whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or part on any act, omission, transaction, event or other occurrence taking place on or after the Petition Date through and including the Effective Date in any way relating to the Debtors, the Non-Debtor Subsidiaries, the Chapter 11 Cases, the Plan or the Disclosure Statement, and that could have been asserted by or on behalf of the Debtors or their Estates against (i) the following individuals who were serving as an officer or director of the Debtors or their Non-Debtor Subsidiaries on or after the Petition Date: Dennis Stogsdill, Mark E. Brown, Arnaud Danel, Eugene I. Davis, C. Scott Eschbach, Miles Hartfeld, Thomas Y. Hartley, Paul Kimmel, Patrick O'Leary, S. Clay Rogers, and Bradley E. Scher, (ii) the attorneys, accountants, investment bankers, restructuring consultants and financial advisors of each of the Debtors, (iii) the Prepetition Collateral Agent, each of the Senior Lenders and their professionals, and (iv) the members of the Committee and the Committee's professionals; provided, however, that nothing in Section 10.2(a) of the Plan shall be construed to release any party from fraud, willful misconduct, criminal conduct or gross negligence as determined by a Final Order. In addition, the releases contained in Section 10.2(a) of the Plan will not apply to or otherwise affect the obligations of any of the Debtors' present and former directors and officers to repay loans or advances of money or other property owed to the Debtors or their Estates.

(b)     Releases by the Debtors for Pre-Petition Conduct.

Pursuant to Section 10.2(b) of the Plan, as of the Effective Date, for good and valuable consideration, the adequacy of which is confirmed in the Plan, the Debtors in their individual capacities and as debtors-in-possession will be deemed to release and forever waive all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action and liabilities whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or part on any act, omission, transaction, event or other occurrence taking place prior to the Petition Date in any way relating to the Debtors or the Non-Debtor Subsidiaries, and that could have been asserted by or on behalf of the Debtors or their Estates against (i) Dennis Stogsdill, Alvarez & Marsal North America, LLC and all of its affiliates, (ii) Lowenstein Sandler PC, Greenberg Traurig, LLP, and all of their employees or agents, or (iii) the Prepetition Collateral Agent, each of the Senior Lenders and their professionals; provided, however, that nothing in Section 10.2(b) of the Plan shall be construed to release any party from fraud, willful misconduct, criminal conduct or gross negligence as determined by a Final Order. In addition, the releases contained in Section 10.2(b) of the Plan shall not apply to or otherwise affect the obligations of any of the Debtors' present and former directors and officers to repay loans or advances of money or other property owed to the Debtors or their Estates.

(c)     Releases by Holders of Claims.

Pursuant to Section 10.2(c) of the Plan, on the Effective Date, all Entities who (a) directly or indirectly, have held, hold, or may hold Claims, (b) vote to accept the Plan as set forth on the relevant Ballot, and (c) do not mark their Ballot to indicate their refusal to grant the releases provided in Section 10.2(c) of the Plan, shall be deemed, by virtue of their receipt of Distributions and/or other treatment contemplated under the Plan, to have forever released and covenanted with (i) the Debtors, the Non-Debtor Subsidiaries, Dennis Stogsdill, Alvarez & Marsal North America, LLC and all of its affiliates, (ii) Lowenstein Sandler PC, Greenberg Traurig, LLP, and all of their employees or agents, or (iii) the Prepetition Collateral Agent, each of the Senior Lenders and their professionals; and (iv) the Committee and its professionals (collectively the "Released Parties," and each a "Released Party") not to (y) sue or otherwise seek recovery from any of the Debtors or any Released Party on account of any Claim, including but not limited to any Claim based upon tort, breach of contract, violations of federal or state securities laws or otherwise, based upon any act, occurrence, or failure to act from the beginning of time through the Effective Date in any way related to the Debtors or their business and affairs, or (z) assert against any of the Debtors or any Released Party any claim, obligation, right, cause of action or liability that any holder of a Claim or Interest may be entitled to assert, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, based in whole or in part on any act or omission, transaction, or occurrence from the beginning of time through the Effective Date in any way relating to the Debtors, the Chapter 11 Cases, or the Plan, provided, however, (i) none of the Released Parties shall be released from any claim primarily based on any act or omission that constitutes fraud, willful misconduct, criminal conduct or gross negligence as determined by a Final Order, (ii) the foregoing release shall not apply to Administrative Expense Claims or obligations arising under the Plan, and (iii) the foregoing release shall not be construed to prohibit a party in interest from seeking to enforce the terms of the Plan.  Notwithstanding anything to the contrary in the Plan, the releases of the Released Parties shall extend only to claims arising against such Released Parties arising out of or relating to their conduct in connection with the Debtors.  Any Holder of a Claim may mark its Ballot to indicate its refusal to grant the releases provided in this paragraph without prejudice to its right to receive a Distribution under this Plan.

(d)     Releases by the Senior Lenders.

Notwithstanding anything to the contrary in the Plan, nothing in the Plan shall be construed to constitute a release by the Senior Lenders of any Claims they held, hold, or may hold, against the Released Parties.

3.     Injunction Related to Releases.

Pursuant to 10.2(d) of the Plan, the Confirmation Order will permanently enjoin the commencement or prosecution by any entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities released pursuant to the Plan, including but not limited to the claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities released in Section 1102 of the Plan.  Such injunction shall not apply to a Holder of a

Claims that marks its Ballots to indicate its refusal to grant the releases provided in Section 10.2 of the Plan or actions prosecuted by the Securities and Exchange Commission.

      4.      <u>Enforcement of the Director/Officer Settlement.</u>

Once approved by Final Order of the Bankruptcy Court, the Director/Officer Settlement shall be enforceable consistent with the terms of this Plan and pursuant to the D&O Settlement Agreement.

      5.      <u>No Discharge of Claims.</u>

Pursuant to Section 1141(d)(3) of the Bankruptcy Code, Confirmation will not discharge Claims against the Debtors.

      6.      <u>Exculpation and Limitation of Liability.</u>

**Section 10.4 of the Plan provides that, notwithstanding any other provision of this Plan, neither the Debtors, the members of the Committee, the Committee, the Prepetition Collateral Agent, the Senior Lenders, nor any of their respective present or former members, officers, directors, employees, advisors or attorneys shall have or incur any liability to, or be subject to any right of action by, any Holder of a Claim or an Equity Interest, or any other party in interest, or any of their respective agents, employees, representatives, financial advisors, attorneys, or agents acting in such capacity, or affiliates, or any of their successors or assigns, for any act or omission arising out of the Chapter 11 Cases, formulating, negotiating or implementing the Plan (including this Disclosure Statement), the solicitation of acceptances of the Plan, the pursuit of confirmation of the Plan, the confirmation of the Plan, the consummation of the Plan or the administration of the Plan or the property to be distributed under the Plan, except for their gross negligence or willful misconduct as determined by a Final Order, and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under this Plan; provided, however, nothing in Section 10.4 shall be deemed to waive any objections to any Claims against any of the Debtors or any rights to object to any such Claims or to bring an adversary proceeding to subordinate Claims under Section 510(c) of the Bankruptcy Code, except for such rights, objections, claims and defenses with respect to the Senior Lender Claims which are expressly waived pursuant to the Plan. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations and any other applicable law or rules protecting such released parties from liability.**

      7.      <u>Liquidating Trust Injunction.</u>

**Except as expressly contemplated by the Plan or the Confirmation Order, all Entities who have held, currently hold or may hold Claims against or Interests in the Debtors or their Estates that arose prior to the Effective Date (including, but not limited to, Governmental Units, and any official, employee or other entity acting in an individual or official capacity on behalf of any Governmental Unit) will be permanently enjoined from: (i) commencing or continuing in any manner, directly, or indirectly, any action or other proceeding against the Liquidating Trust, the Liquidating Trustee, the Liquidating Trust**

Board, and each of their members, designees, or agents (in such capacity) (collectively, the "Liquidating Trust Protected Parties"); (ii) enforcing, attaching, executing, collecting or recovering in any manner, directly or indirectly, any judgment, award, decree, or order against any Liquidating Trust Protected Party or its property; (iii) creating, perfecting, or enforcing, directly or indirectly, any lien or encumbrance of any kind against any Liquidating Trust Protected Party or its property; (iv) asserting or effecting, directly or indirectly, any setoff or right of subrogation of any kind against any obligation due to any Liquidating Trust Protected Party or its property; and (v) any act, in any manner, in any place whatsoever, that does not conform to, comply with, or is inconsistent with the provisions of this Plan in respect of the Liquidating Trust Protected Parties and their property. Any Entity injured by any willful violation of such injunction will recover actual damages, including, but not limited to, costs and attorneys' fees and expenses, and, in appropriate circumstances, may recover punitive damages from the willful violator. Nothing contained in Section 10.5 of the Plan will prohibit the Holder of a Disputed Claim in Class 5 of this Plan from litigating its right to seek to have such a Disputed Claim declared an Allowed Claim in such Class 5 and paid in accordance with the distribution provisions of the Plan or the Liquidating Trust Agreement, or enjoin or prohibit the interpretation or enforcement by the Holder of such Disputed Claim of any of the obligations of any Liquidating Trust Protected Party under the Plan.

8.   Term of Bankruptcy Injunction or Stays.

Pursuant to Section 10.6 of the Plan, all injunctions or stays provided for in the Chapter 11 Cases under Section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

9.   Votes Solicited in Good Faith.

Pursuant to Section 10.7 of the Plan, the Debtors (and each of their respective affiliates, agents, directors, officers, members, employees, advisors, and attorneys) will, upon confirmation of the Plan, be deemed to have, solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code and, therefore, will not be liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan.

10.   Subordination.

Under the Plan, the classification and manner of satisfying all Allowed Claims and the respective Distributions and treatments under the Plan take into account and/or conform to the relative priority and rights of the Claims and Equity Interests in each Class in connection with the contractual, legal and equitable subordination rights relating thereto whether arising under contract, general principles of equitable subordination, Section 510(b) of the Bankruptcy Code or otherwise.

11.   Insurance.

Confirmation of the Plan and the occurrence of the Effective Date shall have no effect on insurance policies of the Debtors in which the Debtors are or were insured parties. Each

insurance company is prohibited from, and the Confirmation Order shall include an injunction against, denying, refusing, altering or delaying coverage on any basis regarding or related to the Chapter 11 Cases, this Plan or any provision within this Plan, including the treatment or means of liquidation set out within the Plan for insured Claims.

**J.      Miscellaneous Plan Provisions.**

1.      Retention of Jurisdiction.

Pursuant to Article XI of the Plan and the Confirmation Order, the Court shall retain exclusive jurisdiction over the Chapter 11 Cases for the purpose of determining any matters pertaining to the Plan, or the Confirmation Order as well as determining all disputes, suits or controversies arising out of the Plan and its interpretation, enforcement or consummation. Persons reading this Disclosure Statement should refer to the Plan for a more detailed discussion of the Court's continuing jurisdiction over the Debtor and the Chapter 11 Cases.

2.      Termination of the Committee.

The appointment of the Committee shall terminate on the Effective Date and the members of such Committee shall be released and discharged from all further rights and duties arising from or related to the Chapter 11 Cases. The Professionals retained by the Committee shall not be entitled to assert any Administrative Expense Claims nor shall they have an Allowed Administrative Expense Claims for any services rendered or expenses incurred after the Effective Date except in respect of the preparation and prosecution of or any objection to any Committee Professional final fee application.

3.      Exemption from Transfer Taxes.

As provided for in Section 12.6 of the Plan, in accordance with Section 1146(a) of the Bankruptcy Code, the Bankruptcy Court shall be requested to make findings, in the Confirmation Order, that: (i) the issuance, transfer or exchange of security under the Plan or the making or delivery of an instrument of transfer, and (ii) the transfers of the Debtors' assets shall not be taxed under any law imposing stamp or similar tax. Consistent with the foregoing, each recorder of deeds or similar official for any county, city or governmental unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument, without requiring the payment of any stamp or similar tax.

4.      Tax Reporting and Compliance.

Pursuant to Section 12.7 of the Plan, the Debtors shall be authorized, on behalf of each of the Debtors, to request an expedited determination under Section 505 of the Bankruptcy Code of the tax liability of the Debtors for all taxable periods ending after the Petition Date through, and including, the Effective Date.

## VII.  LIQUIDATION ANALYSIS; BEST INTERESTS TEST

Pursuant to Section 1129(a)(7) of the Bankruptcy Code (commonly referred to as the "Best Interests Test"), the Bankruptcy Code requires that each Holder of an Impaired Claim or Impaired Equity Interest either (a) accepts the Plan or (b) receives or retains under the Plan property of a value, as of the Effective Date, that is not less than the value such Holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on the Effective Date.

The first step in meeting this test is to determine the proceeds that would be generated from the hypothetical liquidation of the Debtors' assets and properties in the context of a chapter 7 liquidation.  The gross amount of cash and cash equivalents available would be the sum of the proceeds from the disposition of the Debtors' assets and the Cash held by the Debtors at the time of the commencement of their chapter 7 cases.  Such amount is reduced by the amount of any Claims secured by such assets, the costs and expenses of the liquidation, and such additional administrative expenses and priority claims that may result from the termination of the Debtors' businesses and the use of chapter 7 for the purposes of a hypothetical liquidation.  Any remaining net Cash would be allocated to creditors and stockholders in strict priority in accordance with Section 726 of the Bankruptcy Code.

In a chapter 7 liquidation, a trustee in bankruptcy would be appointed and the net amount generated from the liquidation of the Debtors' Assets would be reduced by the administrative expenses of both the chapter 7 cases and the Chapter 11 cases.  The cost of a chapter 7 liquidation would include the fees and commissions of a trustee in bankruptcy, as well as those of counsel and other professionals that might be retained by the trustee in addition to unpaid expenses incurred by the Debtors during the Chapter 11 cases.  These expenses and costs would reduce the net proceeds available to Holders of Allowed Claims.  The present value of distributions from the liquidation proceeds (after deducting the amounts described above) is then compared with the present value of the property obtained in each of the Classes of Claims and Equity Interests under the Plan to determine if the Plan is in the best interests of each Creditor or Holder of an Equity Interest.

The Debtors believe that the Plan will produce a greater recovery for Holders of Claims than would be achieved in a chapter 7 liquidation.  The Debtors are not seeking to require Holders of Claims to accept non-cash consideration so that the Estates could pursue going concern value.  During the course of the Chapter 11 cases, the Debtors have essentially liquidated all of their valuable assets.  As described in the Disclosure Statement, the stock of MediCor's primary foreign operating subsidiaries, Eurosilicone, Biosil, and Nagor were sold and the Debtors believe that their remaining foreign and domestic affiliates have limited or no value. The net proceeds of the sale of Eurosilicone in the sum of $20,366,100.03 as of January 31, 2010, are being held in escrow by Debtors' counsel.  These proceeds shall be applied to pay the Receiver Settlement, to cover the costs of completing the liquidation and windup of the Debtors' businesses and for distribution to Holders of Allowed Claims.  Additionally, pursuant to the Plan, the Estates' valuable litigation claims will be pursued by the Liquidating Trustee and the litigation proceeds will be distributed to the Holders of Allowed Senior Lender Deficiency Claims and Allowed General Unsecured Claims.

All of the Cash and Litigation Claims available for distribution to Holders of Allowed Claims are the cash collateral of the Senior Lenders. In a chapter 7 liquidation, the Senior Lenders would be entitled to recover all of their cash collateral from the Debtors and Holders of General Unsecured Claims would not receive any distribution. Pursuant to the General Unsecured Creditor Settlement, the Senior Lenders have agreed to carve out and forgo a portion of their recovery on account of the Allowed Senior Lender Secured Claims in order to support the confirmation of the Plan. Such agreement is contingent on approval of the Debtors' Chapter 11 Plan. Accordingly, the Debtors believe that the Holders of Allowed Claims will receive a greater distribution than they would receive if the Chapter 11 Cases were converted to chapter 7 cases.

Additionally, a chapter 7 liquidation would likely result in a significant increase in Claims because there would be an additional tier of Administrative Expense Claims by the trustee in bankruptcy and his or her professionals. The chapter 7 trustee's professionals, including legal counsel and accountants, would add substantial administrative expenses that would be entitled to be paid ahead of Allowed Claims against the Debtors. Although the Debtors have already incurred many of the expenses associated with liquidating the Debtors' assets, the Cash to be distributed to Creditors would be reduced by the chapter 7 trustee's statutory fee, which is calculated on a sliding scale from which the maximum compensation is determined based on the total amount of moneys disbursed or turned over by the chapter 7 trustee. See Exhibit E attached hereto. The Estates would also be obligated to pay all unpaid expenses incurred by the Debtors during the Chapter 11 cases (such as compensation for professionals) which are allowed in the Chapter 7 case. Additionally, it is likely that distributions from a chapter 7 estate would be significantly deferred. As a result, the present value of such distributions is likely to be lower than if made under the Plan.

The Debtors estimate that the liquidation costs in a Chapter 7 case to be approximately $746,250.00 and believe such amounts will exceed the amount of Plan Expenses that will be incurred in implementing the Plan and winding up the affairs of the Debtors. The estimated recovery of the Secured Lenders under the Plan is approximately 25%. The recovery of the Secured Lenders in a chapter 7 liquidation would be less than their projected recovery under the Plan due to the additional expenses of a chapter 7 trustee and the value lost due to the anticipated delay in any distribution on liquidation. Moreover, the recovery of the Secured Lenders upon liquidation could be substantially less than that under the Plan as a result of litigation of the Receiver's constructive trust claims and any other challenges to the Secured Lenders' liens and claims.

For the reasons set forth above, the Debtors believe that the Plan provides a superior recovery for Holders of Claims, and the Plan meets the requirements of the Best Interest Test.


# VIII. FEASIBILITY

Pursuant to Section 1129(a)(11) of the Bankruptcy Code, among other things, the Bankruptcy Court must determine that confirmation of the Plan is not likely to be followed by the liquidation or need for further financial reorganization of the Debtors or any successors to the Debtors under the Plan (unless such liquidation or reorganization is proposed in the Plan). This

condition is often referred to as the "feasibility" of the Plan. The Debtors believe that the Plan clearly satisfies this requirement because all of the Debtors' remaining assets will be distributed to Holders of Allowed Claims pursuant to the terms of the Plan and, provided the Plan is confirmed and consummated, the estates will no longer exist to be subject to future reorganization or liquidation.

## IX.  RISK FACTORS

**ALL IMPAIRED HOLDERS OF CLAIMS SHOULD READ AND CAREFULLY CONSIDER THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT, PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN.**

**A.  Bankruptcy Factors.**

1.  <u>Classifications of Claims.</u>

Parties in interest may object to the Debtors' classification of Claims.  Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The Debtors believe that the classification of claims and interests under the Plan complies with the requirements set forth in the Bankruptcy Code.  However, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

2.  <u>Non-Occurrence of the Effective Date.</u>

If the conditions precedent to the Effective Date, which are discussed in detail in Section 9.2 of the Plan, have not been satisfied or waived, the Bankruptcy Court may vacate the Confirmation Order.  THERE CAN BE NO ASSURANCE THAT ALL OF THE VARIOUS CONDITIONS TO THE EFFECTIVENESS OF THE PLAN WILL BE TIMELY SATISFIED OR WAIVED.  In the event that the conditions to effectiveness have not been timely satisfied or waived, the Plan would be deemed null and void and the Debtors may propose or solicit votes on an alternative plan that may not be as favorable to parties in interest as the current Plan.

3.  <u>Failure to Receive Requisite Accepting Votes.</u>

There can be no assurance that the requisite acceptances to confirm the Plan will be received.  In order for the Plan to be accepted, of those Holders of Claims who cast ballots, the affirmative vote of at least two-thirds (2/3) in amount and more than one-half (1/2) in number of Allowed Claims in each voting class is required.  If the requisite votes are not received to accept the Plan, the Chapter 11 Case could be converted chapter 7 of the Bankruptcy Code.  There can be no assurance that the distributions under a liquidation under chapter 7 of the Bankruptcy Code would be similar to or as favorable to Holders of Claims as those proposed in the Plan.  The Debtor believes that distributions to Creditors would be reduced under a chapter 7 proceeding, as discussed in Article VII of this Disclosure Statement.

4.      Failure to Confirm the Plan.

Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting creditor or equity holder of the Debtors might challenge the adequacy of this Disclosure Statement or the balloting procedures and results as not being in compliance with the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determined that the Disclosure Statement and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for confirmation had not been met, including that the terms of the Plan are fair and equitable to non-accepting Classes. Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, a finding by the Bankruptcy Court that the Plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting Classes, confirmation of the Plan is not likely to be followed by a liquidation or a need for further financial reorganization and the value of distributions to non-accepting Holders of claims and interests within a particular class under the Plan will not be less than the value of distributions such Holders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. While there can be no assurance that these requirements will be met, the Debtors believe that the Plan will not be followed by a need for further financial reorganization and that non-accepting Holders within each Class under the Plan will receive distributions at least as great as would be received following a liquidation under chapter 7 of the Bankruptcy Code when taking into consideration all administrative claims and costs associated with any such chapter 7 case.

The confirmation of the Plan and occurrence of the Effective Date are also subject to certain conditions as described in Article IX of the Plan. If the Plan is not confirmed, it is unclear what distributions Holders of Claims ultimately would receive with respect to their Claims. If an alternative reorganization could not be agreed to, it is possible that the Debtors would have to liquidate their assets, in which case it is likely that Holders of Claims would receive substantially less favorable treatment than they would receive under the Plan.

The Debtors and the Liquidating Trustee reserve the right to object to the amount or classification of any Claim or Equity Interest. The estimates set forth in this Disclosure Statement cannot be relied on by any creditor whose Claim is subject to an objection. Any such Claim Holder may not receive its specified share of the estimated distributions described in this Disclosure Statement.

5.      Risk of Additional or Larger Claims.

The holders of Claims in Class 3, Class 4 and Class 5 are subject to the risk of dilution if the total amount of the Claims against the Debtors are higher than the Debtors' estimate. The Disclosure Statement and its attached exhibits necessarily include estimates, including estimates of future events. These estimates include, but are not limited to, estimates as to the total amount of Claims that will be asserted against the Debtors and the outcome of Disputed Claims. The Debtors believe that the estimates presented are reasonable and appropriate under the circumstances. Nevertheless, there is a risk that unforeseen future events may cause one or more of these estimates to be materially inaccurate. Among the potential risks are the risk that additional pre-petition or Administrative Expense Claims may be asserted, that Disputed Claims

may be resolved at higher amounts than expected or that the resolution of such Claims may require the expenditure of unanticipated professional fees.

**B.     Other Risk Factors.**

1.     <u>Variances from Projections.</u>

As noted in the Plan and this Disclosure Statement, the Debtor have estimated distributions to Holders of Allowed Claims based upon certain financial projections.   The projections reflect assumptions concerning, among other thing, the Debtors' ability to control expenses.   The Debtors believe the assumptions underlying the projections are reasonable; however, unanticipated events occurring subsequent to the preparation of the projections may affect the actual financial results of the Debtors.

2.     <u>Litigation Risks.</u>

The Plan provides, among other things, for the Litigation Claims to be conveyed into the Liquidating Trust, with the Litigation Fund, available, in part, to facilitate the prosecution of the Litigation Claims and Disputed Claims.   Although the Debtors anticipate that the Liquidating Trust, in time, will resolve the Litigation Claims and Disputed Claims on a basis providing a substantial net benefit to the Debtors' estates, there can be no guarantee that the result will be favorable.   There also can be no assurance that the Litigation Fund will be sufficient to fund completely the prosecution of the Litigation Claims and the Disputed Claims.

# X.  CERTAIN FEDERAL INCOME TAX CONSEQUENCES

The following discussion is a summary of certain United States federal income tax aspects of the Plan, is for general information purposes only, and should not be relied upon for purposes of determining the specific tax consequences of the Plan with respect to a particular holder of a Claim or Interest.  This discussion does not purport to be a complete analysis or listing of all potential tax considerations.

This discussion is based on existing provisions of the Internal Revenue Code of 1986, as amended (the "IRC"), existing and proposed Treasury Regulations promulgated thereunder, and current administrative rulings and court decisions.   Legislative, judicial, or administrative changes or interpretations enacted or promulgated after the date hereof could alter or modify the analyses set forth below with respect to the United States federal income tax consequences of the Plan.  Any such changes or interpretations may be retroactive and could significantly affect the United States federal income tax consequences of the Plan.   To the extent that the following discussion relates to the consequences to holders of Allowed Claims, it is limited to holders that are United States persons within in the meaning of the IRC.

The federal income tax consequences of the Plan are complex and are subject to significant uncertainties.   No ruling has been requested or obtained from the Internal Revenue Service (the "IRS") with respect to any tax aspects of the Plan and no opinion of counsel has been sought or obtained with respect thereto.  Thus, no assurance can be given as to whether the

IRS will agree with the assertions and conditions discussed herein. No representations or assurances are being made to the holders of Claims or Interests with respect to the United States federal income tax consequences described herein.

This summary is limited to those holders of Claims or Equity Interests who have held such Claims and Equity Interest as capital assets. Certain holders (including, among others, insurance companies, banks, tax exempt organizations, financial institutions, broker-dealers, small business investment companies, regulated business companies, investors in pass-through entities, foreign companies and persons who are not citizens or residents of the United States) may be subject to special rules and are not discussed below. In addition, this summary does not address the foreign, state or local tax consequences of the Plan.

Any discussion of United States federal tax issues set forth in this Disclosure Statement is written solely in connection with the confirmation of the Plan to which the transactions described in this Disclosure Statement are ancillary. Such discussion is not intended or written to be legal or tax advice to any person and is not intended or written to be used, and cannot be used, by any person for the purpose of avoiding any United States federal tax penalties that may be imposed on such person. Each holder of a Claim or Interest should seek advice based on its particular circumstances from an independent tax advisor.

## A.    Certain U.S. Federal Income Tax Consequences to the Debtors.

Under the IRC, a taxpayer generally must include in gross income the amount of any cancellation of indebtedness income ("COD income") realized during the taxable year. Section 108 of the IRC provides an exception to this general rule, however, if the cancellation occurs in a case under the Bankruptcy Code, but only if the taxpayer is under the jurisdiction of the bankruptcy court and the cancellation is granted by the court or is pursuant to a plan approved by the court.

Section 108 of the IRC requires the amount of COD income so excluded from gross income to be applied to reduce certain tax attributes of the taxpayer. The tax attributes that may be subject to reduction include the taxpayer's net operating losses and net operating loss carryovers (collectively, "NOLs"), certain tax credits and most tax credit carryovers, capital losses and capital loss carryovers, tax bases in assets, and foreign tax credit carryovers. Attribute reduction is calculated only after the tax for the year of the discharge has been determined. Section 108 of the IRC further provides that a taxpayer does not realize COD income from cancellation of indebtedness to the extent that payment of such indebtedness would have given rise to a deduction.

Under the Plan, Holders of Allowed Claims are expected to receive less than full payment on their Claims. The Debtors' liability to the Holders of Claims in excess of the amount satisfied by distributions under the Plan will be canceled and therefore, will result in COD income to the Debtors. The Debtors should not realize any COD income, however, to the extent that payment of such Claims would have given rise to a deduction to the Debtors had such amounts been paid. In addition, any COD income that the Debtors realize should be excluded from the Debtors' gross income pursuant to the bankruptcy exception to Section 108 of the IRC described in the immediately preceding paragraph.

The exclusion of COD income, however, will result in a reduction of certain tax attributes of the Debtors. Because attribute reduction is calculated only after the tax for the year of discharge has been determined, the COD income realized by the Debtors under the Plan should not diminish the NOLs and other tax attributes that may be available to offset any income and gains recognized by the Debtors in the taxable year that includes the Effective Date.

**B.      Certain U.S. Federal Income Tax Consequences to Holders of Allowed Claims.**

A Holder of an Allowed Claim will generally recognize ordinary income to the extent that the amount of Cash or property received (or to be received) under the Plan is attributable to interest that accrued on a Claim but was not previously paid by the Debtors or included in income by the Holder of the Allowed Claim. A Holder of an Allowed Claim will generally recognize gain or loss equal to the difference between the Holder's adjusted basis in its Claim and the amount realized by the Holder upon consummation of the Plan that is not attributable to accrued but unpaid interest. The amount realized will equal the sum of Cash and the fair market value of other consideration received (or to be received).

The character of any gain or loss that is recognized will depend upon a number of factors, including the status of the creditor, the nature of the Claim in its hands, whether the Claim was purchased at a discount, whether and to what extent the creditor has previously claimed a bad debt deduction with respect to the Claim, and the creditor's holding period of the Claim. If the Claim in the creditor's hands is a capital asset, the gain or loss realized will generally be characterized as a capital gain or loss. Such gain or loss will constitute long-term capital gain or loss if the creditor is a non-corporate taxpayer and held such Claim for longer than one year or short-term capital gain or loss if the creditor held such Claim for less than one year.

A Holder of an Allowed Claim who receives, in respect of its Claim, an amount that is less than its tax basis in such Claim may be entitled to a bad debt deduction if either: (i) the Holder is a corporation; or (ii) the Claim constituted (a) a debt created or acquired (as the case may be) in connection with a trade or business of the Holder or (b) a debt the loss from the worthlessness of which is incurred in the Holder's trade or business. A Holder that has previously recognized a loss or deduction in respect of its Claim may be required to include in its gross income (as ordinary income) any amounts received under the Plan to the extent such amounts exceed the Holder's adjusted basis in such Claim.

Holders of Claims who were not previously required to include any accrued but unpaid interest with respect to in their gross income on a Claim may be treated as receiving taxable interest income to the extent any consideration they receive under the Plan is allocable to such interest. Holders previously required to include in their gross income any accrued but unpaid interest on a Claim may be entitled to recognize a deductible loss to the extent such interest is not satisfied under the Plan.

Holders of a Claim constituting any installment obligation for tax purposes may be required to currently recognize any gain remaining with respect to such obligation if, pursuant to the Plan, the obligation is considered to be satisfied at other than its face value, distributed, transmitted, sold or otherwise disposed of within the meaning of Section 453B of the IRC.

The Holders of Class 3 Senior Lender Secured Claims, Class 4 Senior Lender Deficiency Claims and Class 5 General Unsecured Claims are expected to receive only a partial distribution of their Allowed Claims and Holders of Class 2 Southwest Exchange Claims, Class 6 Interdebtor Claims, Class 7 Non-Debtor Subsidiary Claims and Class 8 and Stock Claims will not receive any distributions under the Plan on account of their Claims or Interests. Whether the Holder of such Claims will recognize a loss, a deduction for worthless securities or any other tax treatment will depend upon facts and circumstances that are specific to the nature of the holder and its Claims. Accordingly, the Holders of Class 2 Southwest Exchange Claims, Class 3 Senior Lender Secured Claims, Class 4 Senior Lender Deficiency Claims, Class 5 General Unsecured Claims, Class 6 Interdebtor Claims, Class 7 Non-Debtor Subsidiary Claims and Class 8 Stock Claims should consult their own tax advisors.

**C.      Certain Consequences to Holders of Equity Interests.**

Pursuant to the Plan, all Equity Interests in the Debtors are being extinguished. A holder of any Equity Interest extinguished under the Plan should generally be allowed a "worthless stock deduction" in an amount equal to the adjusted basis in the holder's Equity Interest. If the holder held the Equity Interest as a capital asset, the loss will be treated as a loss from the sale or exchange of a capital asset. Capital gain or loss will be long-term if the Equity Interest was held by the holder for more than one year; otherwise, it will be a short-term gain or loss. Any capital losses realized generally may be used by a corporate holder only to offset capital gains, and by an individual holder only to the extent of capital gains, plus $3,000 of other income.

**D.      Reservation of Rights.**

This tax section is subject to change (possibly substantially) based on subsequent changes to other provisions of the Plan. The Debtors and their advisors reserve the right to further modify, revise or supplement this Article X and the other tax related sections of the Plan up to ten (10) days prior to the date by which objections to Confirmation of the Plan must be filed and served.

**E.      Importance of Obtaining Professional Tax Assistance.**

**THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A CLAIM HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, CLAIM HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE UNITED STATES FEDERAL, STATE AND LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.**

# XI.  ALTERNATIVES TO THE PLAN

The Debtors have determined that the Plan is the most practical means of providing for maximum recoveries to the Holders of Allowed Claims.  Alternatives to the Plan which have been considered and evaluated by the Debtors during the course of the Chapter 11 cases include (i) liquidation of the Debtors' remaining assets under chapter 7 of the Bankruptcy Code, (ii) an alternative chapter 11 plan and (iii) dismissal of the Chapter 11 Cases.  Thorough consideration of these alternatives to the Plan have led the Debtors to conclude that the Plan, in comparison, will likely provide a greater recovery to Holders of Allowed Claims on a more expeditious timetable, and in a manner which minimizes certain inherent risks in any other course of action available to the Debtors.

## A.  Liquidation Under Chapter 7

If the Plan or any other chapter 11 plan for the Debtors cannot be confirmed under Section 1129(a) and (b) of the Bankruptcy Code, the Chapter 11 Cases may be converted to a case under chapter 7 of the Bankruptcy Code, in which case a trustee(s) would be elected or appointed to liquidate any remaining assets of the Debtors for distribution to Holders of Allowed Claims pursuant to chapter 7 of the Bankruptcy Code.  If a trustee(s) is appointed and the remaining assets of the Debtors are liquidated under chapter 7 of the Bankruptcy Code, all creditors holding General Unsecured Claims may receive distributions of a lesser value on account of its Allowed Claims and may have to wait a longer period of time to receive such distributions than they would under the Plan.

## B.  Alternative Chapter 11 Plan

If the Plan is not confirmed, the Debtors, or any other party in interest, may attempt to formulate an alternative chapter 11 plan which might provide for the liquidation of its remaining assets other than as provided by the Plan.  However, since substantially all of the Debtors' assets have already been converted to Cash and the Plan provides for the distribution of the proceeds in accordance with the statutory priorities established by the Bankruptcy Code and the settlement between the Debtors, the Senior Lenders and the Committee, the Debtors believe that such alternative chapter 11 plan will necessarily be substantially similar to the Plan.  The prosecution of an alternative chapter 11 plan would unnecessarily delay creditors' receipt of distributions yet to be made and, due to the incurrence of additional administrative expenses during such period of delay, may provide for smaller distributions to holders of General Unsecured Claims than are currently provided for in the Plan.  Accordingly, the Debtors believe that the Plan will enable all creditors to realize the greatest possible recovery on its respective Claims with the least delay.

## C.  Dismissal.

Upon dismissal of the Chapter 11 Cases, the protections of the Bankruptcy Code would disappear, thereby resulting in costly, uncontrolled and protracted litigation in various jurisdictions among and between the Holders of Claims.  Therefore, the Debtors believe that dismissal of the Chapter 11 Cases is not a viable alternative to Confirmation of the Plan.

**D.      Certain Risk Factors**

In the event that the Plan is not confirmed the Debtors will incur substantial expenses related to the development and confirmation of a new plan of reorganization and possibly the approval of a new disclosure statement.    This would only prolong unnecessarily the administration of the Debtors' assets and negatively affect creditors' recoveries on their Claims.

Likewise, as described above, in the event this matter is converted to a case under chapter 7 of the Bankruptcy Code, the Debtors will incur substantial expenses related to hiring additional professionals.  As the Debtors' assets have already been liquidated, the additional cost will only serve to reduce distributions to creditors.


## XII.  RECOMMENDATIONS

The Debtors believe that the Plan is substantially preferable to any other plan, liquidation under chapter 7 of the Bankruptcy Code or a dismissal of these chapter 11 cases.  Conversion of these chapter 11 Cases to chapter 7 proceedings would result in substantial delays in the distribution of proceeds available under such an alternative, and significantly increase administrative costs, including trustees fees, expenses and commissions, and, therefore, would materially reduce Creditor recoveries and, therefore, the Debtors strongly recommend that you vote in favor of the Plan.


## XIII.  CONCLUSION

It is important that you exercise your right to vote on the Plan.  The Debtors believe that the Plan fairly and equitably provides for the treatment of all Claims against, and Equity Interests in, the Debtors and recommends that you vote in favor of the Plan.

Dated:  February 24, 2010

Respectfully submitted,

*/s/ Dennis A. Meloro*
GREENBERG TRAURIG, LLP
Victoria W. Counihan (DE Bar No. 3488)
Dennis Meloro (DE Bar No. 4435)
The Nemours Building
1007 North Orange Street, Suite 1200
Wilmington, Delaware 19801
Telephone:  (302) 661-7000
Facsimile:  (302) 661-7360

– and –

LOWENSTEIN SANDLER PC
Kenneth A. Rosen
Jeffrey D. Prol
Jeffrey A. Kramer
Michael Savetsky
65 Livingston Avenue
Roseland, New Jersey 07068
Tel: (973) 597-2500
Fax: (973) 597-2400

Counsel for Debtors and Debtors in Possession